517 S.E.2d 449

**Eva Mae DUNCAN, Guardian of Vicki Duncan, Respondent,**

**v.**

**HAMPTON COUNTY SCHOOL DISTRICT # 2, Appellant.**

**No. 2995.**

Court of Appeals of South Carolina.

Heard March 9, 1999.

Decided May 10, 1999.

Rehearing Denied June 26, 1999.

536

538

Bruce E. Davis and Robert A. Kerr, Jr., both of Davis, Craver, Hagood & Kerr, of Charleston, for appellant.

Lee S. Bowers and Mary Kay Siren, both of Bowers & Siren, of Estill; Gary D. Brown, of Ridgeland; and James B. Richardson, Jr., of Svalina, Richardson & Larson, of Columbia, for respondent.

HOWELL, Chief Justice:

Hampton County School District # 2 (the District) appeals a jury verdict awarding Vicki Duncan damages she incurred when she was sexually assaulted while under the District's supervision. We affirm.

Duncan filed a complaint against the District alleging grossly negligent supervision. The District denied the allegations and claimed immunity under the South Carolina Tort Claims Act (SCTCA).[1] At the close of the plaintiff's case and of all the evidence, the District moved for a directed verdict, arguing the plaintiff produced no evidence that the District was grossly negligent, that the assault was unforeseeable, and that the District was entitled to discretionary immunity. The trial court denied the motions. The jury returned a verdict for Duncan awarding her $1,000,000 actual damages. The trial court reduced the damages award to $250,000 pursuant to the SCTCA, but otherwise denied the District's motions for a judgment notwithstanding the verdict (JNOV), new trial absolute, and new trial *nisi remittur*.

## I.

The District contends the trial court erred in denying its motions for directed verdict and JNOV. It asserts it exercised at least slight care and thus was not grossly negligent. We disagree and find sufficient evidence in the record to support the jury's finding of gross negligence.

"In deciding motions for directed verdict and those for judgment notwithstanding the verdict, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. If more than one inference can be drawn from the evidence, the case must be submitted to the jury." *Howard v. State Farm Mut. Auto. Ins. Co.*, 316 S.C. 445, 451, 450 S.E.2d 582, 585–86 (1994) (citation omitted).

## A.

The facts, viewed in the light most favorable to Duncan, are as follows.

Duncan, sixteen years old, attended high school in the District. Her IQ of 38 qualified her for the District's Trainable Mentally Handicapped (TMH) program.[2] Sharlene Mastic taught Duncan in the TMH class.

---

1. S.C.Code Ann. §§ 15–78–10 to –200 (Supp.1998).

2. An IQ of 38 equates to a mental age of approximately four years and three months.

Mastic had planned a trip to Beaufort, South Carolina, for her class to participate in the Special Olympics. Mastic's responsibilities required her to travel ahead of the class to prepare for the events. She received permission from Anderson Taylor, her principal, to do so. Approximately 40 students and 8 teachers would travel by bus with Barbara Mitchell, Mastic's aide, who would be in charge of supervising the seven students from Mastic's class.

Because Mastic doubted Mitchell's ability to competently supervise the students by herself,[3] Mastic separately spoke with Taylor and Jean Stokes, the assistant principal, about employing a substitute teacher to provide additional supervision.[4] Because other adults would be present, Taylor determined a substitute was unnecessary.

---

**3.** Mitchell had been a teacher in the District for many years. While a teacher, Mitchell's principal reprimanded her for failing to control her classroom, poor organizational and planning skills, and wasting instructional time. The District refused to renew Mitchell's teaching contract because of her failure to control her class and supervise her students. The District then placed Mitchell in charge of copying for the District. She also worked in the high school library as a health media specialist. Mitchell later became a teacher's aide for Leslie Fogleman.

Fogleman complained to the principal and superintendent about Mitchell's inability to handle her responsibilities of "shadowing" one child and Mitchell's poor conduct such as falling asleep in class. Fogleman eventually wrote a letter to the superintendent stating she would not return as a teacher if the District placed Mitchell as her aide again because it was easier to control the students when Mitchell was asleep in the classroom. The District then transferred Mitchell to Mastic's class.

Mastic testified she experienced problems with Mitchell prior to the Beaufort trip, including Mitchell's falling asleep in class. On one occasion, Mastic learned that two students in her class had sex while Mitchell was charged with their supervision. Mastic discussed these problems with her supervisor, assistant principal, and principal on prior occasions. However, Mastic was told that the administration could not do anything with Mitchell because Mitchell's father was on the District's school board.

**4.** As noted above, two weeks prior to the incident at bar, two students from the TMH class engaged in sex while under Mitchell's supervision. Jerome Grant, Duncan's classmate and the alleged assailant in this case, saw this prior event. Moreover, Mastic testified that TMH students were easily influenced by their surroundings because their bodies were much more mature than their minds. Consequently, to protect them from sexual misbehavior, she stated that they must be watched very carefully.

The students returned from the Beaufort trip and, under Mitchell's supervision, waited in front of the District building for a bus to take them home. Mitchell left the children to go to the bathroom. Duncan, Grant, Valerie Johnson, and Belle Fields, all members of the TMH class, then left the group. They went around the side of the District building and into a stairwell. Johnson and Fields acted as lookouts while Grant attempted sexual intercourse with Duncan.[5]

At some point during these activities, Mildred Gadsen, a fourth grade teacher, walked into the District building and saw Duncan bent over with her pants and underwear pulled down while Grant stood immediately behind Duncan. When Gadsen walked in, Grant ran away and Duncan said, "he made me do it." When Gadsen first saw Duncan and Grant, Duncan was not struggling or complaining in any way and did not seem upset. When Gadsen took Duncan to Mitchell, Duncan cried hysterically.

That evening, Duncan's guardian, Eva Mae Duncan (Eva Mae), took Duncan to the hospital for an examination and reported the incident to the sheriff's department. The sheriff's report indicated that Grant took Duncan by the hand, told Duncan to take off her clothes, had sex with Duncan despite her verbal resistance, and then ran when Duncan threatened to tell. The hospital's evaluation rape kit did not indicate a rape, although the officer that filled out the incident report testified that this is not dispositive of whether a rape occurred.

After the incident, Eva Mae prohibited Duncan from returning to school because the District refused to transfer either Duncan or Grant to a different classroom. The school officials told Eva Mae that they could not remedy the situation and that Eva Mae must send Duncan back to class. Eva Mae did not comply with this request. Some time later, the truancy officer for Hampton County signed a warrant for the

5. These facts come from Mastic's subsequent investigation of the incident. However, the evidence conflicts as to exactly what happened. Mitchell testified that she did not go to the bathroom while taking care of the students after their trip. She claimed she merely granted Duncan's request to use the bathroom by herself, because Duncan often went to the restroom on her own and other adults were around the building. Furthermore, after Duncan returned, Mitchell claimed that Duncan denied any sexual activity.

arrest of Duncan's mother, Mary Duncan (Mary), who did not have custody of Duncan and had no idea Duncan was not attending her classes. Mary was incarcerated, tried and found guilty by a local magistrate, and ordered to send Duncan to school. As a result, Eva Mae sent Duncan back to school. However, upon returning to class, Duncan became withdrawn and indicated a desire not to go to school, behavior she did not display prior to the incident. As of the date of trial, Duncan and Grant still attended the same class.

There is evidence that Duncan incurred substantial emotional harm as a result of the incident at bar. Mitchell testified that Duncan was crying hysterically when she returned to the front of the District building with Gadsen. Chaslyn Vanderburgh, Duncan's bus driver, explained that Duncan was still crying hysterically when she got on the bus. Moreover, Eva Mae stated that Duncan was crying when she arrived at home. Eva Mae indicated that, after the incident, Duncan would sleep for "hours and hours" more than usual and appeared to be sadder than before. Each time Duncan talked about the details of the incident she became very anxious and upset and cried often.

Lori Ann Rogers, who was qualified as an expert in counseling sexually abused children, interviewed Duncan. During the interview, Duncan cried and exhibited very anxious and emotional behavior. Rogers commented that Duncan felt unsafe and insecure about attending school. Rogers claimed that Duncan's future sense of safety would be jeopardized and that her psychological problems had been heightened due to Grant's continued presence in the classroom. Rogers recommended individual and family counseling for Duncan and suggested placing Duncan in a classroom different from Grant for her emotional well-being.

Patricia Malphrus, who was also qualified as an expert in counseling sexually abused children, counseled Duncan. In the counseling sessions, Duncan's anxiety escalated when asked to speak of the details of the incident. In Malphrus's opinion, Duncan had been traumatized by the incident and suffered from an "adjustment disorder with a mixed disturbance of anxiety and [chronic] depression." Malphrus also concluded that Duncan would suffer future trauma as a result

of the incident and that putting Grant and Duncan in the same classroom would set back Duncan's recovery. Though Malphrus admitted that Duncan had made progress in dealing with the incident, Malphrus testified that Duncan needed more counseling.

## B.

■ Preliminarily, we note that the District also argues it cannot be held liable in this case because it is entitled under the SCTCA to immunity for its discretionary acts. *See* S.C.Code Ann. § 15–78–60(5) (Supp.1998). The analysis of this issue and the gross negligence issue both hinge on whether the record contains any evidence of gross negligence. Consequently, we discuss the two issues together.

■ Under the SCTCA,

[t]he State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein.

S.C.Code Ann. § 15–78–40 (Supp.1998). In S.C.Code Ann. § 15–78–60 (Supp.1998), the SCTCA provides certain exemptions from or limitations on the government's liability for its torts. The burden of proving any of these exceptions to the general rule of governmental liability as a private individual "is upon the governmental entity asserting it as an affirmative defense." *Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 430, 445 S.E.2d 439, 440 (1994). The exceptions pertinent to this case provide as follows:

The governmental entity is not liable for a loss resulting from:

. . .

(5) the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee; [or]

. . .

(25) [the performance of a] responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner;*

. . . .

S.C.Code Ann. §§ 15–78–60(5) & (25) (Supp.1998) (emphasis added).

■ However, this Court has previously held that subsection five must be read in conjunction with subsection twenty-five. *See Jackson v. South Carolina Dep't of Corrections,* 301 S.C. 125, 128, 390 S.E.2d 467, 469 (Ct.App.1989), *aff'd,* 302 S.C. 519, 397 S.E.2d 377 (1990). Thus, "[i]f discretion is exercised in a grossly negligent manner," then the governmental entity involved is liable for its torts as if it were a private individual. *Jackson,* 301 S.C. at 128, 390 S.E.2d at 469. We must therefore determine if there is any evidence indicating that the District was grossly negligent. If such evidence exists, then the District is not entitled to immunity under the SCTCA.

Gross negligence has been defined as "the failure to exercise slight care"; "the intentional, conscious failure to do something which it is *incumbent* upon one to do or the doing of a thing intentionally that one ought not to do"; and "a relative term" meaning "the *absence of care that is necessary under the circumstances.*" *Hollins v. Richland County School Dist. One,* 310 S.C. 486, 490, 427 S.E.2d 654, 656 (1993) (citations omitted).

The record contains evidence from which a jury could conclude the District was grossly negligent. Grant testified and Mastic concluded that Mitchell left the students unattended while she used the restroom, despite her knowledge of the previous sexual encounter between two other students. Mastic explained that TMH students need constant supervision to ensure their safety. From these facts alone, the jury could determine the District was grossly negligent. Nevertheless, even if we assume Mitchell's version of the facts to be true, she was only charged with supervising seven students and there is no evidence of how two to three students in addition

to Duncan strayed away from Mitchell's sight. Thus, even in this scenario, the jury could conclude that the District was grossly negligent.

## II.

█ The District argues expert testimony was required to establish the standard of care for TMH students. Because *the District* did not raise this argument below, it is not preserved. *See Connolly v. People's Life Ins. Co.,* 299 S.C. 348, 351, 384 S.E.2d 738, 740 (1989) (holding that a party must state a specific ground for a directed verdict motion in order to preserve the issue for appellate review); *Glover v. North Carolina Mut. Life Ins. Co.,* 295 S.C. 251, 256, 368 S.E.2d 68, 72 (Ct.App.1988) ("A motion for judgment n.o.v. under Rule 50(b)[, SCRCP,] is a renewal of the directed verdict motion and is limited to the grounds asserted in the directed verdict motion.").[6]

## III.

█ The District contends Duncan failed to establish the foreseeability of her injuries and thus failed to establish legal cause. We disagree.

█ A plaintiff proves legal cause by establishing foreseeability. Foreseeability is determined by looking to the natural and probable consequences of the complained of act. The defendant's negligence does not

---

6. At the close of the evidence, the District made a motion for a directed verdict, but never mentioned the issue of whether expert testimony was required to establish the standard of care. However, before announcing his ruling, the trial court took up the issue *sua sponte.* In response, the District merely stated "that if there was a need for such testimony, it should have been presented by the plaintiff." Even though the trial court discussed the issue, the District never took a position on whether expert testimony was required. The District merely stated what it believed the consequences of the trial court's conclusion would be. This failure to explicitly move for a directed verdict on the issue renders it not preserved. *See Mize v. Blue Ridge Ry. Co.,* 219 S.C. 119, 129–30, 64 S.E.2d 253, 258 (1951) (An issue was not preserved even though the trial court explicitly approached the issue, because the appellant did not mention the issue in its directed verdict motion; the trial court's discussion did "not have the effect of enlarging the grounds upon which said motion was made.").

have to be the sole proximate cause of the plaintiff[']s injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury.

*Bishop v. South Carolina Dep't of Mental Health,* 331 S.C. 79, 88–89, 502 S.E.2d 78, 83 (1998) (citations omitted).

 "[I]n order to establish liability, *it is not necessary the person charged with negligence should have contemplated the particular event which occurred.* It is sufficient that he should have foreseen his negligence would probably cause injury to someone." *Greenville Mem'l Auditorium v. Martin,* 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990) (citation omitted) (emphasis added). "Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence." *Small v. Pioneer Mach. Inc.,* 329 S.C. 448, 464, 494 S.E.2d 835, 843 (Ct.App.1997).

The record contains evidence that, only two weeks prior to the incident at issue, two students engaged in a sexual act when supervised by Mitchell. The record also contains evidence that TMH students have normal teenage bodies but only child-like mentalities. Consequently, sexual acts between these students were reasonably predictable. Mastic testified Mitchell should not be responsible for supervising the students. Mitchell's prior employment record provided the District with ample evidence of Mitchell's inability to competently supervise students. Thus, there is sufficient evidence in the record for the jury to conclude Duncan's injuries stemmed from the natural and probable consequences of the District's and Mitchell's gross negligence. *See Greenville Mem'l Auditorium,* 301 S.C. at 245–46, 391 S.E.2d at 548 (upholding a jury's foreseeability determination despite it being the first instance the incident in question occurred).

## IV.

 After the trial court announced the damages verdict, the foreman of the jury passed a sheet of paper to the court. The paper was signed by all the members of the jury and contained three recommendations: That Mitchell be reas-

signed from a teaching aide to an administrative post, that the District remove Duncan from the class with her alleged assailant, and that the police record of Duncan's mother be cleared of the charge of failing to send Duncan to school. On appeal, the District contends the trial court should have granted the District's motion for a new trial absolute because the size of the damages award and the recommendations indicate that the jury's verdict was the result of passion, caprice, prejudice, or other improper considerations. We disagree.

The trial court *must* grant a new trial absolute "if the verdict is so grossly excessive that it shocks the conscience of the court and clearly indicates the amount of the verdict was the result of caprice, passion, prejudice, partiality, corruption, or other improper motive." *Knoke v. South Carolina Dep't of Parks, Recreation and Tourism,* 324 S.C. 136, 141, 478 S.E.2d 256, 258 (1996). Alternatively, the trial court *may* grant a new trial absolute when, sitting as the thirteenth juror, it concludes the jury's verdict is not supported by the evidence. *See Vinson v. Hartley,* 324 S.C. 389, 402, 477 S.E.2d 715, 722 (Ct.App.1996). However, "[t]he jury's determination of damages is entitled to substantial deference." *Knoke,* 324 S.C. at 141, 478 S.E.2d at 258. On appeal, the appellate court reviews a denial of a new trial motion for an abuse of discretion. *See Vinson,* 324 S.C. at 403–06, 477 S.E.2d at 722–23. The appellate court will not reverse the trial court's decision unless it is controlled by an error of law or is not supported by the evidence. *See id.*

The District argues that *Sanders v. Prince,* 304 S.C. 236, 403 S.E.2d 640 (1991), requires the granting of a new trial in the case at bar. We disagree. In *Sanders,* Atlee Prince and Naomi Sanders were members of a school board. Sanders was its chairperson and Prince was its vice-chairperson. Prince became suspicious that the board was mismanaging its funds. As a result, he formed the board's Standing Committee on Finance and was elected its chairperson. As chairperson, he ordered an audit of the board's finances. Later, he claimed certain board members were attempting to impede this audit. 304 S.C. at 237, 403 S.E.2d at 641. Consequently, feeling he had no other option, Prince held a news conference and alleged fraudulent actions within the Sanders administration. *Id.* at 237–38, 403 S.E.2d at 641–42. Sanders sued for

defamation. *Id.* at 238, 403 S.E.2d at 642. Shortly after beginning deliberations, the jury asked the trial court whether it could force Prince to resign from the board. *Id.* at 239, 403 S.E.2d at 642. The jury ultimately returned a verdict for Sanders, awarding her $1.25 million actual damages and $750,-000 punitive damages. *Id.* at 238, 403 S.E.2d at 642.

Although the trial court properly handled the situation, Prince claimed on appeal that the jury's question was evidence of passion and caprice affecting the jury's verdict to a degree that warranted a new trial. The Supreme Court agreed. It held that the size of the verdict as compared to the evidence of damages, in conjunction with the jury's question, demanded a new trial. In so holding, it noted that Sanders had been re-elected to the board as chairperson and, therefore, could not have suffered millions of dollars in damages to her reputation. *Id.* Thus, while the jury's question may have been evidence of an improper motive on the jury's part, the lack of evidence to support the size of the verdict played a major role in the court's decision.

In contrast, here, the evidence *supports* the large damage award given. There is evidence that Duncan cried hysterically from the time she returned to the front of the District building until she arrived at the hospital that evening and that she still cries when forced to recall the details of the incident. The record indicates that since the incident, Duncan has been uncharacteristically withdrawn, sad, and disinterested in school. Both experts testified that Duncan was very traumatized by the event and that her symptoms of depression had been augmented by Grant's continued presence in the classroom with Duncan. Also, both experts predicted future problems for Duncan in the form of a loss of her sense of safety and the occurrence of flashbacks.

In addition, the jury in the case at bar did not attempt to usurp its authority as did the jury in *Sanders*, 304 S.C. at 239, 403 S.E.2d at 642. Here, after the trial court published the verdict, the jury passed up to the court certain recommendations. These recommendations were not demands or requests to make demands. Significantly, these recommendations are consistent with a reasonable view of the evidence and do not

indicate that the jury's verdict was based on an improper motive.

In conclusion, in contrast to the facts in *Sanders,* the evidence in this case supported a large jury verdict. Moreover, the jury's recommendations in this case did not indicate a decision made on an improper motive. For these reasons, we cannot conclude that the jury's verdict was so grossly excessive as to be motivated by passion, prejudice, or any other improper motive. Hence, we uphold the trial court's refusal of the District's motion for a new trial absolute.[7]

## CONCLUSION

For the foregoing reasons, the trial court's orders are **AFFIRMED**.

GOOLSBY and CONNOR, JJ., concur.

---

7. The District also claims that the damages award was "so unduly liberal" that it indicated an intent to punish and was essentially a punitive damages verdict. Accordingly, it argues that this Court should analyze the verdict under Constitutional precedent limiting the awards of punitive damages. We disagree. As discussed above, the evidence presented to the jury was sufficient to support the actual damages award. Consequently, we hold that the damages award was not so large as to amount to punitive damages.