336 S.C. 373 (1999)
520 S.E.2d 142
Mike STEINKE and Mary Steinke, individually and as personal representatives of the estate of Zachary Steinke; and Linda Nash Given, individually and as personal representative of the estate of Michael Nash, Respondents,
v.
SOUTH CAROLINA DEPARTMENT OF LABOR, LICENSING AND REGULATION, Appellant.
No. 24999.
Supreme Court of South Carolina.
Heard May 12, 1999.
Decided September 7, 1999.
Rehearing Denied October 6, 1999.
*382 Andrew F. Lindemann, William H. Davidson, II, and David L. Morrison of Davidson, Morrison and Lindemann, P.A., Columbia, for appellant.
John Kassel and John Nichols of Suggs and Kelly, P.A., Columbia, and B. Randall Dong of Simpson, Dong and Wingate, L.L.C., Columbia, for respondents.
WALLER, Justice:
Mike and Mary Steinke, the parents and personal representatives of the estate of Zachary Steinke, and Linda Nash Given, the mother and personal representative of the estate of Michael Nash (Respondents), brought wrongful death actions against the South Carolina Department of Labor, Licensing, and Regulation (Department). The jury awarded the statutory beneficiaries of each teenager $1 million in actual damages. Nash's award was reduced to $900,000 because the jury concluded he was ten percent at fault.[1]
The trial judge denied Department's motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial. Department appealed. The Court of Appeals certified this case to this Court because it involves issues of significant public interest and legal principles of major importance. See S.C.Code Ann. § 14-8-210(c) (Supp.1998); Rule 204(b), SCACR (formerly contained in Rule 214(b), SCACR). We affirm in part and reverse in part.

FACTS
Zachary Steinke, a 17-year-old bungee jumper, and Michael Nash, a 19-year-old bungee jump master, died August 10, 1993, when the steel cage in which they were riding fell 160 feet to the ground at Beach Bungee, an attraction near Myrtle Beach. Zachary's parents saw the accident happen. His mother, a registered nurse, and his father tried to save *383 Zachary by performing cardiopulmonary resuscitation upon him.
Beach Bungee's owners initially used a "crawlevator" to carry bungee jumpers and sightseers to the top of a 160-foot metal arch. The crawlevator was a chain-driven device that ran along the supports of the metal arch. A steel cage attached to the crawlevator carried jumpers and spectators. After a person jumped, the crawlevator lowered spectators and the suspended jumper to the ground by slowly descending the arch. Although bungee jumping was not regulated, Department considered the crawlevator a ride subject to regulation under the South Carolina Amusement Rides Safety Code[2] because it carried spectators. Department issued a permit for the crawlevator in May 1993.
The crawlevator had persistent mechanical problems, sometimes stalling or violently shaking passengers as the chain jerked along the track. Beach Bungee owners took the crawlevator out of service in mid-July 1993. They hired Marshall Beam, a local shrimp boat mechanic, to install an electric winch and cable to lift the steel cage. Beam attached the winch to the base of the arch, fashioned three pulleys to guide a single metal cable through the structure of the metal arch, and connected the cable to the cage as it sat beneath the center of the arch. Two stabilizing cables were attached to a static line to prevent the cage from rotating or swaying, but they provided no actual support for the cage. The winch could not be controlled from inside the cage. The jump master used hand signals to tell the winch operator on the ground when the cage was properly positioned for a jump. Operators also painted a blue mark on the cable to identify the proper stopping point.
The accident occurred when the ride operator, owner Harold Morris, became distracted during the three minutes or so it took the cage to travel to the top of the arch. When Morris failed to stop the winch, it kept pulling the three-eighths-inch cable after the cage jammed into the arch. Someoneperhaps Zachary or Michael or spectatorscried, "Stop! Stop!" As horrified onlookers watched, the single lifting cable *384 snapped and the cage plummeted to the ground. It was the sixth day the operators had used the winch and cable system.
Major defects in the system included the use of a single cable without additional safety cables, incorrectly sized pulleys, a powerful winch capable of snapping the single cable with relative ease, the lack of controls or an emergency stop button inside the cage, and the lack of a device to shut off the winch automatically when the cage reached the top of the arch.
Respondents alleged that Department failed to revoke or suspend the license Department had issued, or adequately inspect or investigate the crawlevator, after receiving troubling reports. Those reports were (1) a July 13, 1993, memorandum written by James Cates, a Department field supervisor; (2) an August 5, 1993, telephone conversation between Henry J. McGinnis, president of the Texas manufacturer of the arch and crawlevator, and Floyd Padgett, director of Department's Office of Elevators and Amusement Rides; and (3) an August 5, 1993, facsimile from McGinnis to Padgett.
Cates wrote the July 13, 1993, memo after Department received a report of a malfunction of an electric winch at the ride. Emergency personnel were called to the scene. No one was injured, but a jumper was suspended upside down until repairs were made. Cates filed the memo away after discussing the matter with Padgett. No Department official contacted the Beach Bungee owners or visited the site because, Padgett testified, no one had gotten hurt.
Arch maker McGinnis testified he telephoned Padgett on August 5, 1993. McGinnis told Padgett he had received a report that Beach Bungee may have modified the crawlevator by installing a winch and cable to lift the cage. That was not the system he had designed and McGinnis wanted to ensure any changes had been inspected and approved by a licensed engineer. Beach Bungee's owners and employees had refused to accept McGinnis's calls, apparently due to the crawlevator's mechanical problems and the fact McGinnis's company had not been fully paid. McGinnis, at Padgett's request, outlined his concerns in a fax to Padgett the same day. He wrote that the ride recently had "incurred some type of failure" and asked *385 Department to investigate the matter. Padgett assured him that Department would look into it, McGinnis testified.
Padgett denied having a conversation on August 5 with McGinnis. He testified he spoke with McGinnis on August 6 after receiving McGinnis's fax, but denied McGinnis told him about the winch and cable system. Padgett did not perceive the situation as an emergency and saw no reason to work overtime to follow up on the matter. Cates, however, testified the fax appeared to be more serious than other routine government and manufacturer notices faxed to the Columbia office during 1993.
Jerry Butler, a chief inspector with Department, instructed local inspector Mitchell Ward to go by the Beach Bungee site, but "not to make a special trip." Ward was not aware of the July 13 memo or the August 5 fax. Ward testified he drove by the site at about 6:30 p.m. August 6, 1993, on his way to a bowling date. He was traveling about 20 to 30 mph and did not stop at the site. Ward saw the cage sitting on the ground, but did not see the crawlevator. He did not believe the ride was operating. He passed by the ride again at about 11 p.m. on his way home, but did not stop. In fact, operators used the winch and cable system to carry forty-seven jumpers August 6, including twenty jumpers between 6:10 and 8:30 p.m.
The next afternoon, on a Saturday trip to the mall, Ward pulled his car to the far side of the six-lane highway and observed the ride for about ten minutes. Ward saw the cage on the ground and again noticed the crawlevator was not attached to the track of the arch. He also saw the stabilizing cables and was "stunned" to see a lifting cable attached to the top of the cage. Ward assumed, however, that workers were using the cables to move the cage or crawlevator, which he assumed was broken, during repairs.
Ward did not walk across the highway to get a closer look or speak to the owners. He did not try to telephone the owners later. Ward drove by the site a second time August 7 without stopping. Ward still believed the ride was not operating, and reported that to Department officials in Columbia. Operators used the winch and cable system to carry only five people August 7 due to inclement weather and mechanical problems.
*386 Ward drove by the site on his way to and from work Monday, August 9, 1993, and on his way to work Tuesday morning. He did not stop or even attempt to observe the site as he passed. The fatal accident occurred Tuesday evening.
Department officials Padgett, Butler, Cates, and Ward testified the winch and cable system was dangerous, and acknowledged a failure could result in multiple deaths. The system constituted a substantial modification of the licensed crawlevator. Padgett, Butler, and Ward testified Department officials would have taken immediate steps to shut it down if they had known about it.

STANDARD OF REVIEW
In ruling on motions for directed verdict or judgment notwithstanding the verdict, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions. The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt. This Court will reverse the trial court only when there is no evidence to support the ruling below. Creech v. South Carolina Wildlife and Marine Resources Dep't, 328 S.C. 24, 491 S.E.2d 571 (1997). This Court will not disturb a trial court's decision granting or denying a new trial unless that decision is wholly unsupported by the evidence or the court's conclusions of law have been controlled by an error of law. South Carolina Dep't of Highways and Pub. Transp. v. E.S.I. Investments, 332 S.C. 490, 505 S.E.2d 593 (1998); Craven v. Cunningham, 292 S.C. 441, 357 S.E.2d 23 (1987).

ISSUES
1. Did the trial judge err in ruling that Department owes a special or private duty to riders of a licensed amusement ride, such that respondents have a private cause of action against Department?
2. Is Department immune from suit under various exceptions to the waiver of immunity contained in the Tort Claims Act?

*387 3. Did the trial judge err in rejecting Department's argument that Michael Nash assumed the risk of his injuries and in giving an erroneous jury charge on assumption of the risk?
4. Did the trial judge err in refusing to reduce the verdict in accordance with the Legislature's 1997 re-enactment of monetary limits in suits brought under the Tort Claims Act?

DISCUSSION

1. SPECIAL OR PRIVATE DUTY
Department argues the trial judge erred in rejecting its motions for a directed verdict and judgment notwithstanding the verdict, in which it asserted the Amusement Rides Safety Code gives rise only to a public duty. No special or private duty exception to the public duty rule exists in this case; therefore, Respondents had no private cause of action, Department contends. We disagree.
In a negligence action, a plaintiff must show that the (1) defendant owes a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiffs injury, and (4) plaintiff suffered an injury or damages. Bishop v. South Carolina Dep't of Mental Health, 331 S.C. 79, 502 S.E.2d 78 (1998); Shipes v. Piggly Wiggly St. Andrews, Inc., 269 S.C. 479, 238 S.E.2d 167 (1977); W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts, 164-65 (1984). The court must determine, as a matter of law, whether the law recognizes a particular duty. If there is no duty, then the defendant in a negligence action is entitled to a directed verdict. Ellis v. Niles, 324 S.C. 223, 479 S.E.2d 47 (1996); Sharpe v. South Carolina Dep't of Mental Health, 292 S.C. 11, 16, 354 S.E.2d 778, 781 (Ct.App.1987) (Bell, J., concurring).
In Jensen v. Anderson County Dep't of Social Services, 304 S.C. 195, 403 S.E.2d 615 (1991), the Court explained the public duty rule and the six-factor test for *388 determining whether a governmental entity owes a special or private duty to an injured plaintiff.[3]
Generally, there is no common law duty to act. An affirmative legal duty, however, may be created by statute, contract relationship, status, property interest, or some other special circumstance. Many statutes impose a duty on public officials to perform certain acts. Generally, however, such officials enjoy an immunity from a private cause of action under the public duty rule. This rule holds that public officials are generally not liable to individuals for their negligence in discharging public duties as the duty is owed to the public at large rather than anyone individually....
An exception to this general rule of non-liability exists when a duty is owed to individuals rather than the public only. Our Court of Appeals has developed a test comprised of six elements to determine when such a "special duty" exists:
(1) an essential purpose of the statute is to protect against a particular kind of harm;
(2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm;
(3) the class of persons the statute intends to protect is identifiable before the fact;
(4) the plaintiff is a person within the protected class;
(5) the public officer knows or has reason to know the likelihood of harm to members of the class if he fails to do his duty; and

*389 (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.
Jensen, 304 S.C. at 199-200, 403 S.E.2d at 617 (citing Parker v. Brown, 195 S.C. 35, 10 S.E.2d 625 (1940)). The public duty rule is distinguishable from a defense of immunity, which is an affirmative defense that must be pleaded and can be waived. A defendant who pleads immunity conditionally admits the plaintiffs case, but asserts immunity as a bar to liability. In contrast, the public duty rule is a defense that denies an element of the plaintiffs cause of actionthe existence of a duty of care to the individual plaintiff. Wells v. City of Lynchburg, 331 S.C. 296, 307, 501 S.E.2d 746, 752 (Ct.App. 1998).
In Jensen, the Court determined that child abuse statutes imposed a special duty on the local child protection agency and its social workers to investigate and intervene in cases where child abuse has been reported. Thus, a plaintiff may allege in a private cause of action that the agency failed to properly investigate a report of child abuse. See also Bellamy v. Brown, 305 S.C. 291, 408 S.E.2d 219 (1991) (holding that dismissed official could not sue government agency for breach of confidentiality under state Freedom of Information Act because Act is intended to protect public from secret government activity and did not create any special or private duty to individuals); Wells v. City of Lynchburg, supra (holding plaintiff could not sue city for failing to maintain fire hydrants because it was barred by a provision of the Tort Claims Act and city owed duty only to public generally); Summers v. Harrison Constr., 298 S.C. 451, 381 S.E.2d 493 (Ct.App.1989) (holding that statute requiring county planning department to refuse to issue building permits to unlicensed residential home builders created no special duty, such that department could be held liable for damages on the ground it negligently issued permit to builder); Rayfield v. South Carolina Dep't of Corrections, 297 S.C. 95, 374 S.E.2d 910 (Ct.App.1988) (holding that statutes assigning responsibility for control of departments providing for keeping of records on prisoners created duty owed by prison and parole officials to public generally, not a special duty owed to victims murdered by recently paroled prisoner in random act of violence).
*390 We hold that the trial judge correctly ruled respondents have a private cause of action because the six-factor test from Jensen is met in this case.
First, an essential purpose of the Amusement Rides Safety Code is to protect against a particular kind of harm, i.e., harm caused by poorly designed, constructed, or maintained amusement rides. "The purpose of this chapter is to guard against personal injuries in the ... use of amusement devices ... to persons employed at or attending ... amusement parks, and, in the event of a personal injury, to ensure to the injured party the possibility of financial recovery as against the owner.... It is the intent of this chapter that amusement devices must be designed, constructed, assembled or disassembled, maintained, and operated so as to prevent injuries." S.C.Code Ann. § 41-18-20 (Supp.1998).
The dissent, focusing narrowly upon the language regarding financial recovery against the owner and the necessity of liability insurance, asserts the Legislature intended to prohibit recovery against Department. We certainly agree that recovery against the owner is an important component of the Act, but it is not the sole reason for its existence. As we explain further below, a reading of the entire Act reveals the Legislature imposed numerous specific and crucial duties upon Department in order to ensure the safety of park visitors and workers.
Second, the Act directly imposes on Department a duty to guard against or not cause harm to amusement park visitors and workers. "No amusement device may be operated in the State without a permit issued" by an appropriate Department official. S.C.Code Ann. § 41-18-50 (Supp.1998). Department must inspect an amusement device before issuing a permit. S.C.Code Ann. § 41-18-70 (Supp.1998). Department must re-inspect an amusement device after the owner notifies it of a substantial modification to the device. S.C.Code Ann. § 41-18-80(C) (Supp.1998). Department's director and his designees are "charged with the affirmative duty of administering and enforcing" the Act. S.C.Code Ann. § 41-18-130 (Supp.1998). Furthermore, the Act, when read in its entirety, implicitly imposes upon Department an affirmative duty to investigate promptly after receiving credible *391 reports of suspected hazards. See Adams v. Texfi Industries, 320 S.C. 213, 464 S.E.2d 109 (1995) (in construing a statute, the reviewing court looks to its language as a whole in light of its manifest purpose).
Third, the class of persons the Act intends to protect was identifiable before the fact of the injury. To meet this factor, the class must be readily identifiable in that it is distinguishable from the general public. See Jensen, supra.
The Act's purpose is to prevent injuries to visitors and employees at amusement parks and fairs. S.C.Code Ann. § 41-18-20. Those visitors and employees usually would not constitute a readily identifiable class that is distinguishable from the general public. In this case, however, Department had received several credible reports indicating a particular amusement ride posed a significant safety threat. Members of the larger class of visitors and employees the Act is meant to protectthe riders and workers at a specific, reportedly hazardous amusement ridewere readily identifiable before the fact of the injury. Our reasoning is consistent with Jensen, supra, in which we found that a member of the larger class of persons the child abuse statutes were intended to protectin that case, a single reported victim of abusewas readily identifiable before the fact of the injury. It is not always necessary, as Department and the dissent contend, that members of the protected class actually be known by name to the governmental entity before the fact of an injury.
Fourth, the plaintiffs are within the protected class. Zachary was a park visitor; Michael was employed by Beach Bungee, the owner of an amusement device licensed by Department.
Fifth, Department knows or has reason to know the likelihood of harm to members of the class if it fails to do its duty. Department officials testified the winch and cable system was dangerous, and acknowledged a failure could result in multiple deaths. They conceded the system constituted a substantial modification of the licensed crawlevator. Department officials further testified they would have taken immediate steps to shut it down if they had known about it.
Sixth, Department has sufficient authority to act in the circumstances. Department may revoke a permit after determining *392 an amusement device is, among other things, "being operated without the inspections required" or "being operated with a mechanical, electrical, structural, design, or other defect which presents an excessive risk of injury to passengers, bystanders, operators, or attendants." S.C.Code Ann. § 41-18-60(D)(1) and (3) (Supp.1998). Department officials may enter unannounced and inspect amusement devices at reasonable times and in a reasonable manner. They also have the right to question any owner, manager, or employee and to inspect, investigate, photograph, and sample all pertinent areas, and to examine and copy all pertinent documents and records. S.C.Code Ann. § 41-18-80(E) (Supp.1998). Department may impose civil penalties when an owner fails to comply with the act. S.C.Code Ann. § 41-18-150 (Supp.1998).
Department's reliance upon Adkins v. Varn, 312 S.C. 188, 439 S.E.2d 822 (1993), is misplaced. In that case, a thirteenyear-old girl was fatally injured after vicious dogs chased her into a public street where she was struck and killed by an automobile. Several local residents had complained about the dogs to county animal control personnel. We affirmed the trial court's ruling that the county animal control ordinance did not create a special duty of care towards individual members of the general public. We found no legislative intent to create a special duty because the terms of the ordinance were general and did not identify a particular class of victims or a particular kind of harm. In contrast, the analysis of those factors in this case, as well as the remainder of the six-factor test, reveals the legislative intent to create a special duty.

2. EXCEPTIONS TO WAIVER OF IMMUNITY
Respondents alleged that Department, after receiving reports of substantial modifications, was grossly negligent in failing to inspect or investigate the amusement ride and in failing to suspend or revoke the crawlevator license. Department contends the trial judge erred in rejecting its directed verdict and post-trial motions in which it asserted immunity from suit under several exceptions to the waiver of sovereign immunity contained in S.C.Code Ann. § 15-78-60 (Supp.1998). We disagree.
*393 The South Carolina Tort Claims Act, which provides the exclusive remedy in tort against Department, is a limited waiver of governmental immunity. Moore v. Florence School Dist. No. 1, 314 S.C. 335, 444 S.E.2d 498 (1994); S.C.Code Ann. § 15-78-20(a) (Supp.1998). The Act provides that, subject to limitation, a governmental entity is "liable for [its] torts in the same manner and to the same extent as a private individual under like circumstances." Id.; S.C.Code Ann. § 15-78-40 (Supp.1993).
The burden of establishing a limitation upon liability or an exception to the waiver of immunity under the Tort Claims Act is upon the governmental entity asserting it as an affirmative defense. Strange v. South Carolina Dep't of Highways and Pub. Transp., 314 S.C. 427, 445 S.E.2d 439 (1994). Provisions establishing limitations upon and exemptions from liability of a governmental entity must be liberally construed in favor of limiting liability. S .C.Code Ann. § 15-78-20(f) (Supp.1998); Baker v. Sanders, 301 S.C. 170, 391 S.E.2d 229 (1990).

A. THE LICENSING POWERS EXCEPTION
Department contends it is immune from suit under Section 15-78-60(12). Under that section, a governmental entity is not liable for a loss resulting from "licensing powers or functions, including, but not limited to, the issuance, denial, suspension, renewal, or revocation of or failure to issue, deny, suspend, renew, or revoke any permit, license, certificate, approval, registration, order, or similar authority except when the power or function is exercised in a grossly negligent manner." The trial judge instructed the jury on this exception.
Department asserts the exception applies only to a licensee or potential licensee, not to a third party allegedly injured by the government's licensing decision. Nothing in the statutory language of the provision limits it as Department suggests. A potential licensee, licensee, or an injured third party may seek relief under the exception. See Parsons v. Uniroyal-Goodrich Tire Corp., 313 S.C. 394, 438 S.E.2d 238 (1993) (in construing statute, words must be given their plain *394 and ordinary meaning without resorting to subtle or forced construction to limit or expand statute's operation).
Department also argues it could not be grossly negligent because it did not have any authority to license a bungee jumping operation in 1993. See S.C.Code Ann. §§ 52-19-10 to -380 (Supp.1998) (statutes regulating bungee jumping effective in July 1994). We conclude the trial judge correctly reasoned that respondents' action pertained to modifications of the crawlevator used to carry bungee jumpers and spectatorswhich Department had licensed as an amusement devicenot to the actual jumps that were made.
Department further argues there was no license for Department to revoke because the licensed crawlevator was not in use when the accident occurred. Accepting this argument would mean Department could avoid its duty simply by claiming it was powerless in the face of an unauthorized and unlicensed modification. That would subvert the clear purpose of the licensing exception, which is to hold the governmental entity liable when it is grossly negligent in failing to investigate whether it should suspend or revoke a license after learning of potentially dangerous modifications to the subject of the license. See Adams v. Texfi Industries, supra (in construing a statute, the reviewing court looks to its language as a whole in light of its manifest purpose); Resolution Trust Corp. v. Eagle Lake and Golf Condominiums, 310 S.C. 473, 427 S.E.2d 646 (1993) (purpose of the statute and public policy are aids in construction of a statute).
Finally, Department argues that respondents Steinke are barred by the doctrines of collateral estoppel and judicial estoppel from asserting the winch and cable system was licensed by Department because they asserted it was not licensed in a federal lawsuit against Beach Bungee's owners. See Steinke v. Beach Bungee, Inc., 105 F.3d 192 (4th Cir.1997) (discussing verdict form in which the jury determined by special interrogatory that the winch and cable system was operated without a license from Department).
The Steinkes' position in the two cases is consistent. In the federal lawsuit, the Steinkes asserted and the jury found that the winch and cable system was not licensed. In this case, the *395 Steinkes asserted the crawlevator was licensed, and Department was grossly negligent in failing to suspend or revoke that license after learning the crawlevator may have been replaced by the unlicensed winch and cable system.
We have defined gross negligence as "the failure to exercise slight care." We also have defined it as "the intentional, conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." Gross negligence "is a relative term, and means the absence of care that is necessary under the circumstances." Hollins v. Richland County School Dist. One, 310 S.C. 486, 490, 427 S.E.2d 654, 656 (1993) (citations omitted). Under any of those definitions, the trial judge properly denied Department's directed verdict and post-trial motions when the facts are viewed in the light most favorable to respondents. The record shows Department received three credible reports of a suspected problem or hazard at a licensed amusement device, yet Department gave the matter no more than a cursory glance.

B. THE INSPECTION POWERS EXCEPTION
Department asserts that, regardless of the licensing powers exception, it is immune pursuant to Section 15-78-60(13). Under that section, a governmental entity is not liable for a loss resulting from "regulatory inspection powers or functions, including failure to make an inspection, or making an inadequate or negligent inspection, of any property to determine whether the property complies or violates any law, regulation, code, or ordinance or contains a hazard to health and safety." The trial judge instructed the jury on this exception, which does not contain a gross negligence standard.
This Court and the Court of Appeals previously have recognized that the correct approach, when a governmental entity asserts various exceptions to the waiver of immunity, is to read exceptions that do not contain the gross negligence standard in light of exceptions that do contain the standard. Duncan v. Hampton County School Dist. # 2, 335 S.C. 535, 517 S.E.2d 449 (1999) (reading discretionary immunity exception in light of exception to immunity in which governmental entity exercises its duty in a grossly negligent manner, such *396 that discretionary immunity will not protect the government if it exercises that discretion in a grossly negligent manner); Etheredge v. Richland School Dist. I, 330 S.C. 447, 463, 499 S.E.2d 238, 246 (Ct.App.1998) (when an action is brought alleging gross negligence by a governmental entity pursuant to an exception contained in Section 15-78-60, all other applicable exceptions must be read in light of the exception containing the gross negligence standard), cert. granted on other grounds, April 8, 1999. The principles expressed in Duncan and Etheredge are drawn from Jackson v. South Carolina Dep't of Corrections, 301 S.C. 125, 390 S.E.2d 467 (Ct.App. 1989), aff'd, 302 S.C. 519, 397 S.E.2d 377 (1990).
While provisions establishing limitations upon and exemptions from liability of a governmental entity must be liberally construed to limit liability, we also must presume in construing a statute that the Legislature did not intend to perform a futile thing. See Gaffney v. Mallory, 186 S.C. 337, 195 S.E. 840 (1938). We are constrained to avoid a construction that would read a provision out of a statute, and must reconcile conflicts if possible. Ballard v. Ballard, 314 S.C. 40, 443 S.E.2d 802 (1994).
We hold the inspection powers exception must be read in conjunction with the key exception at issue in this case, Section 15-78-60(12), the licensing powers exception. Department must inspect an amusement device before deciding whether to issue, suspend, or revoke a license. S.C.Code Ann. §§ 41-18-70 and 41-18-80. Department also has an implicit duty to investigate potentially hazardous substantial modifications when it learns of them. It would make no sense to say Department may be found grossly negligent in a licensing decision, yet allow Department to escape liability because the inspection powers exception does not contain a gross negligence standard. The logical way to read these closely related provisions when both are at issue is that a governmental entity may be liable if it is grossly negligent in licensing or inspecting a particular device or activity.
The dissent asserts that Duncan, Etheredge, and Jackson simply stand for the proposition that a specific exception applies over a more general one. We agree the three cases generally illustrate that proposition, although none contains *397 any language indicating that was the underlying rationale. The circuit court and the parties certainly should focus their analysis and jury instructions upon the most pertinent and specific exceptions that apply in a given case. But to unduly emphasize the distinction between "specific" and "general" exceptions ultimately could reduce defenses available to a governmental entity if the court opted to charge only the most specific exceptions. Accordingly, we conclude the better practice is to allow the government to assert all relevant exceptions, and apply the gross negligence standard to all when it is contained in one applicable exception. Our holding is faithful to the legislative intent to limit liability and allow ample defenses, while not allowing a governmental entity to eviscerate the impact of one exception by asserting another.[4]

C. OTHER EXCEPTIONS
Department asserts it is immune pursuant to Section 15-78-60(5) (governmental entity is not liable for performing or failing to perform discretionary acts); Section 15-78-60(4) (governmental entity is not liable for adoption or enforcement, or failing to adopt or enforce, a law or regulation); and Section 15-78-60(20) (governmental entity is not liable for loss resulting from act or omission of person other than an employee, including but not limited to the criminal actions of third persons). None of these exceptions contains a gross negligence standard. The trial judge instructed the jury on discretionary immunity, but ruled the other exceptions did not apply in this case.
To prevail under the discretionary immunity provision, the governmental entity must show that when faced with alternatives, it actually weighed competing considerations and made a conscious decision to act or not to act, and that it used accepted professional standards appropriate to resolve the issue before it. Strange v. South Carolina Dep't of Highways & Pub. Transp., 314 S.C. 427, 445 S.E.2d 439 (1994); Niver v. South Carolina Dep't of Highways & Pub. *398 Transp., 302 S.C. 461, 395 S.E.2d 728 (Ct.App.1990). The record contains scant evidence Department officials exercised their discretion. Regardless, the jury considered the provision and rejected it.
An appellate court will not reverse the trial court's decision to strike an insufficient or irrelevant allegation or defense unless the trial court abuses its discretion. Mayes v. Paxton, 313 S.C. 109, 115, 437 S.E.2d 66, 70 (1993); Williams v. South Carolina Nat'l Bank, 284 S.C. 346, 326 S.E.2d 187 (Ct.App.1985). An abuse of discretion arises where the trial court was controlled by an error of law or where its order is based on factual conclusions that are without evidentiary support. Tri-County Ice and Fuel Co. v. Palmetto Ice Co., 303 S.C. 237, 242, 399 S.E.2d 779, 782 (1990). We conclude the trial judge did not abuse his discretion because the enforcement of law and third party exceptions were not directly at issue in this case.
Furthermore, the same reasoning explained above applies to all three exceptions. It would make no sense to say Department may be found grossly negligent in a licensing decision, yet allow Department to escape liability under one of these exceptions. See Duncan v. Hampton County School Dist. # 2, supra; Etheredge v. Richland School Dist. 1, supra; Jackson v. South Carolina Dep't of Corrections, supra.
In sum, we recognize the trial court often faces Tort Claims Act cases in which at least one of the asserted exceptions contains the gross negligence standard while other asserted exceptions do not. We hold that when an exception containing the gross negligence standard applies, that same standard will be read into any other applicable exception. Otherwise, portions of the Act would be a nullity, which the Legislature could not have intended. In addition, we will overturn the trial court's refusal to charge irrelevant exceptions only for an abuse of discretion.

3. ASSUMPTION OF THE RISK INSTRUCTION
Department argues the trial judge erred in rejecting its motion for a judgment as a matter of law in the case of Michael Nash, the bungee jump master, after the jury determined *399 Nash assumed the risk of his injuries. Department also asserts the judge erred in modifying the assumption of the risk charge in light of a recent Court of Appeals opinion that was not law when Nash's cause of action accrued.
The trial judge instructed the jury on the accepted definition of the affirmative defense of assumption of the risk, i.e., that a plaintiff's conduct may constitute implied assumption of the risk where it is shown that he understood and appreciated a known danger created by the defendant, and then freely and voluntarily exposed himself to it. Mayes v. Paxton, 313 S.C. at 116, 437 S.E.2d at 70. The judge also told the jury, over Department's objection, that "[e]ven if you find that [Nash] assumed the risk in this case, [Nash] may still recover as long as his assumption of the risk was not greater than the gross negligence of the defendant." The jury had to balance any assumption of the risk by Nash with any gross negligence by Department.
The judge drew the balancing instruction from Davenport v. Cotton Hope Plantation Horizontal Property Regime, 325 S.C. 507, 482 S.E.2d 569 (Ct.App.1997) (deciding for first time in South Carolina that implied assumption of risk is one facet of comparative negligence, not a complete defense to an injured plaintiffs claim), aff'd as modified, 333 S.C. 71, 508 S.E.2d 565 (1998).[5] The Court of Appeals decided Davenport I two months before respondents' trial.
The jury awarded Nash's statutory beneficiaries $1 million in actual damages. The judge reduced the award to $900,000 after the jury, in a special verdict form, determined Nash had assumed the risk of his injuries and was ten percent at fault in the accident.
In South Carolina, the "general rule regarding retroactive application of judicial decisions is that decisions creating new substantive rights have prospective effect only, whereas decisions creating new remedies to vindicate existing rights are applied retrospectively. Prospective application is required when liability is created where formerly none existed." Davenport II, 333 S.C. at 87, 508 S.E.2d at 574. In *400 applying our general rule, this Court and the Court of Appeals have made decisions fully retroactive,[6] fully prospective,[7] and selectively prospective.[8]
In Davenport II, we employed the third approach by concluding that the revised view of assumption of the risk applied "to the instant case and to all causes of action that arise or accrue after the date of this opinion. Thus, except for this case, if a cause of action arose or accrued prior to our decision today, it will be governed by the common law form of assumption of risk, if applicable, as it existed under South Carolina *401 case law before this opinion." Davenport II, 333 S.C. at 87, 508 S.E.2d at 574.
We adhere to the prospectivity rule announced in that case. Accordingly, we hold that the trial judge's instructions drawn from Davenport I improperly allowed the jury to consider Nash's assumption of the risk as part of the comparative negligence analysis. Assumption of the risk constituted a complete bar to recovery when Nash's cause of action accrued in 1993, and the trial judge erred in applying the new principles retroactively. We reverse the judgment for Nash's statutory beneficiaries and grant them a new trial. Although the jury determined Nash had assumed ten percent of the risk, the improper instructions undoubtedly affected the jury's deliberations and its answers to questions posed in the special verdict form. Both parties are entitled to a new trial with proper instructions on the law.[9]

4. RE-ENACTMENT OF MONETARY LIMITS
Department contends the trial judge erred in denying its motion for a new trial nisi remittitur, in which it asked the judge to reduce the verdicts for Steinke and Nash to $250,000 each under the Tort Claims Act. Department relies on a provision of the 1997 budget act. The provision re-enacted (or more accurately, restated) the then-existing limits on liability found in S.C.Code Ann. § 15-78-120 (Supp.1998), and clarified "any ambiguity in the General Assembly's intent that there remain reasonable limits upon recovery against the government for tort actions." Act No. 155, 1997 Acts 1567. The provision also increased the statutory limits. The higher limits took effect June 1, 1998, and are not at issue in this case.
The provision states that, "[e]xcept where otherwise provided, this section takes effect [June 14, 1997] and applies to claims or actions pending on that date or thereafter filed, except where final judgment has been entered before that date." Id. at 1571-72, 1611.
*402 In focusing solely on whether the final judgment occurred before June 14, 1997, both parties have overlooked a crucial threshold issue: May the Legislature by a retroactive amendment overrule this Court's prior interpretation of a statute? We conclude the Legislature may not.
In 1994, the Court held the Legislature impliedly had repealed two subsections of the Tort Claims Act, which limit damages and call for apportioned liability, by enacting inconsistent provisions in the Uniform Contribution Among Tort-Feasors Act (Uniform Contribution Act), which call for unlimited, pro rata liability. Southeastern Freight Lines v. City of Hartsville, 313 S.C. 466, 443 S.E.2d 395 (1994). The Legislature quickly responded by providing that the Uniform Contribution Act did not apply to governmental entities and by reinstating the statutory limits, "except for causes of action that have been filed in a court of competent jurisdiction before July 1, 1994." Act No. 497, 1994 Acts 5793 (effective July 1, 1994). Thus, any case filed before July 1, 1994, is not subject to the $250,000 cap for individual claims contained in the Tort Claims Act.[10] Respondents filed their original complaint June 29, 1994two days before the reinstatement of the limits.
This issue implicates the doctrine of separation of powers. See S.C. Const. art. 1, § 8. The Court has stated that
construction of a statute is a judicial function and responsibility. Subject to constitutional limitations, the legislature has plenary power to amend a statute. However, a judicial [interpretation] of a statute is determinative of its meaning and effect, and any subsequent legislative amendment to the contrary will only be effective from the date of its enactment and cannot be applied retroactively. *403 Lindsay v. Nat'l Old Line Ins. Co., 262 S.C. 621, 628-29, 207 S.E.2d 75, 78 (1974) (citation omitted).
The Court held that the Legislature's attempt to declare by a retroactive amendment that insurance companies were entitled to certain investment creditsafter the Court had interpreted statutes to say the companies were not entitled to the creditsviolated the separation of the legislative, executive, and judicial powers of government. Quoting the trial court with approval, the Court recognized the Legislature essentially was telling the Court, "We reverse." The Legislature, however, lacks such authority. Lindsay, 262 S.C. at 628, 207 S.E.2d at 77-78.[11]
We hold that this case, filed before the Legislature reinstated the statutory caps, is controlled by the principles outlined in Lindsay, supra. The Legislature may not retroactively overrule this Court's interpretation of the statutes in Southeastern Freight Lines. The Legislature may, of course, do what it did in 1994, which was to resolve the statutory conflict and reinstate the statutory caps in future cases. We may resolve the issue on this ground even though the parties and trial judge did not. See Weir v. Citicorp Nat'l Services, Inc., 312 S.C. 511, 435 S.E.2d 864 (1993) ("[a] correct decision of the trial court on the wrong ground will be affirmed on appeal"); Rule 220(c), SCACR (appellate court may affirm judgment upon any ground appearing in the record). It is unnecessary to address the parties' arguments about the 1997 provision because Lindsay is dispositive.

*404 CONCLUSION

We affirm the trial judge's ruling that respondents have a private cause of action under the Amusement Rides Safety Code. We affirm the judge's rulings on the exceptions to the waiver of immunity under the Tort Claims Act, and hold that when an applicable exception contains the gross negligence standard, then any other relevant exception must be read in light of that standard. We reverse Nash's judgment and grant the statutory beneficiaries a new trial because the judge erroneously instructed the jury on the revised view of assumption of the risk. Finally, we hold that neither respondent's recovery is limited by the Tort Claims Act because this case was filed before the Legislature reinstated the statutory caps. We find Department's remaining arguments to be without merit.
AFFIRMED IN PART; REVERSED IN PART.
TOAL, Acting C.J., and BURNETT, J., concur.
MOORE, J., dissenting in a separate opinion.
Acting Associate Justice GEORGE T. GREGORY, Jr., not participating.
MOORE, Justice:
Because I disagree with the majority's holding that respondents have a private cause of action under the South Carolina Amusement Rides Safety Code, I respectfully dissent.
Under the public duty rule, public officials are generally not liable to individuals for negligence in the discharge of their public duties unless there exists a "special duty" to the plaintiff as an individual rather than simply to the public at large. Jensen v. Anderson County Dep't of Soc. Serv., 304 S.C. 195, 403 S.E.2d 615 (1991). Where a duty is owed to the public only, a public official is not liable to an individual who may have been incidentally injured by the failure to perform it. Id; Parker v. Brown, 195 S.C. 35, 10 S.E.2d 625 (1940).
As discussed in the majority opinion, we apply a six-factor test to determine whether a "special duty" exists. One of these factors is that "the class of persons the statute intends to protect is identifiable before the fact." Jensen, 403 S.E.2d *405 at 617 (emphasis added). There must be a "special relationship" that exists between the public official and the plaintiff. Id.
The facts in Jensen are especially instructive since it is the only case finding a special duty. In that case, we found a special relationship existed between the Department of Social Services and a child who was the reported victim of child abuse. After the report, no investigation was made and the child died from subsequent abuse. We found a special relationship was established when the child abuse was initially reported and this special relationship therefore existed before the facts giving rise to the cause of action in that case, i.e. the child's death from the subsequent abuse.
In this case, there is no evidence of any special relationship between Department and respondents to distinguish respondents from members of the general public. The South Carolina Amusement Safety Code applies to protect all members of the general public. Respondents were not identifiable members of a particular class before the facts giving rise to this cause of action.
Further, as stated in Jensen, the six-factor test for a special duty is a means of determining legislative intent. 403 S.E.2d at 618. Accordingly, we cannot overlook the legislative intent expressed in the statute itself. The South Carolina Amusement Rides Safety Code expressly provides its legislative intent is
to guard against personal injuries in the assembly, disassembly, and use of amusement devices at carnivals, fairs, and amusement parks to persons employed at or attending carnivals, fairs, and amusement parks and, in the event of a personal injury, to ensure to the injured party the possibility of financial recovery as against the owner of the carnival, fair, or amusement park where the injury occurred.

S.C.Code Ann. § 41-18-20 (Supp.1998) (emphasis added). In furtherance of this purpose, S.C.Code Ann. § 41-18-90 (Supp. 1998) requires the owner or lessee of an amusement device to have liability insurance. These provisions evidence no intent to make Department itself an insurer of the safety of these devices.
*406 In conclusion, I would reverse the denial of Department's motion for judgment notwithstanding the verdict on the ground respondents have no private cause of action under the South Carolina Amusement Rides Safety Code.
Further, even if I were to concur in the result reached by the majority in this case, I cannot agree with its analysis of the inspection powers exception discussed in Part 2. The majority concludes under the Tort Claims Act that where two exceptions to liability may apply, if one allows for liability in cases of gross negligence, that same standard of liability must be read into any other applicable exception as well. I completely disagree with this analysis.
First, I note there is no need to reach this sweeping conclusion here since the trial judge properly instructed the language of § 15-78-60(13), which contains the inspection powers exception, and did not add a gross negligence standard to it as Department complains.
Moreover, there is no reason to conclude that all applicable exceptions to liability must be read together. The majority overstates the significance of the Court of Appeals' decisions in Duncan, Etheredge, and Jackson. A careful reading indicates these cases simply illustrate our recently stated rule that a specific exception applies over a more general one. Wooten v. South Carolina Dept. of Transportation, 333 S.C. 464, 511 S.E.2d 355 (1999). In a situation such as this, however, where more than one equally specific exception may apply, it is for the jury to determine which exception, if any, applies under the facts of the case.[1]
For instance, assuming a duty in this case, the jury could find no liability from Department's failure to inspect under the inspection exception as properly charged by the trial judge. On the other hand, under the licensing exception, the jury could find Department liable because it was grossly negligent *407 in failing to revoke the permit for the erawlevator when it had reason to believe the device was unsafe.[2]
In light of the majority's concession that we must liberally construe the Tort Claims Act in favor of limiting government liability, it is inconsistent to conclude that a lesser degree of immunity must prevail when more than one exception to liability may apply. To the contrary, under this rule of construction, one would logically conclude such a merging of exceptions would incorporate the greater immunity, not the lesser. In my view, such a merging is unnecessary. There is no inconsistency in allowing the jury to consider the specific exceptions individually.
NOTES
[1] The Steinkes won a $12 million verdict for emotional damages against Beach Bungee, Carolina Lane Holding Co., and the owners of the two companies in an action brought in federal district court. The Fourth Circuit affirmed on the issue of the owners' individual liability, but remanded for the district court to decide whether the verdict should be reduced in light of a recent United States Supreme Court opinion. Steinke v. Beach Bungee, Inc., 105 F.3d 192 (4th Cir.1997.)
[2] S.C.Code Ann. §§ 41-18-10 to -150 (1986 & Supp.1998).
[3] Both parties have assumed the public duty rule applies in this case. Other courts disagree about the continued validity of the public duty rule in light of the demise of absolute sovereign immunity and the advent of acts such as the South Carolina Tort Claims Act. The Act declares that governmental entities "are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein." S.C.Code Ann. § 15-78-40 (Supp.1998). See Leake v. Cain, 720 P.2d 152, 159 (Colo.1986) (noting that while public duty doctrine may still be the majority view, growing trend is to abandon it); Annot., 38 A.L.R.4th 1194 (1985) (collecting numerous cases in which courts have applied or abandoned the public duty doctrine). We do not address the continued validity of the public duty rule because that issue is not before us.
[4] We granted Department's motion to argue against the precedent of Etheredge and Jackson, and find it proper to discuss and clarify a significant point of law previously addressed three times by the Court of Appeals.
[5] We shall refer to the Court of Appeals' decision as Davenport I and our decision as Davenport II.
[6] Simmons v. South Carolina Farm Bureau Mut. Ins. Co., 301 S.C. 267, 391 S.E.2d 560 (1990) (retroactively applying prior decision that created no new substantive right, but merely provided a method for determining whether insurance policy should be reformed); Toth v. Square D Co., 298 S.C. 6, 377 S.E.2d 584 (1989) (retroactively applying prior decision that allowed evidence of employee handbook provisions in an action against employer because the decision merely created a new remedy to vindicate the existing right to bring a breach of contract action).
[7] Russo v. Sutton, 310 S.C. 200, 422 S.E.2d 750 (1992) (prospectively abolishing the "heart balm" tort of alienation of affections); Boan v. Watson, 281 S.C. 516, 316 S.E.2d 401 (1984) (prospectively abolishing the dower rights of widows whose husbands died after the filing of the opinion); Hyder v. Jones, 271 S.C. 85, 245 S.E.2d 123 (1978) (prospectively applying statute abrogating parental immunity); Douglass v. Florence General Hospital, 273 S.C. 716, 259 S.E.2d 117 (1979) (prospectively applying judicial and statutory modification of charitable immunity for hospitals); McCaskey v. Shaw, 295 S.C. 372, 368 S.E.2d 672 (Ct.App.1988) (prospectively applying Supreme Court case that first recognized tort of negligent infliction of emotional distress).
[8] A court uses selective or modified prospectivity when it applies a rule to the case at bar and to all future cases. See McCall v. Batson, 285 S.C. 243, 329 S.E.2d 741 (1985) (prospectively abolishing sovereign immunity, except the immunity did not apply in this case or in any case filed before July 1, 1986, in which the government defendant had liability insurance coverage); Ludwick v. This Minute of Carolina, 287 S.C. 219, 337 S.E.2d 213 (1985) (first recognizing the tort of wrongful discharge of an employee in violation of public policy and applying decision in this case and prospectively); Brown v. Anderson County Hospital Ass'n, 268 S.C. 479, 234 S.E.2d 873 (1977) (modifying doctrine of charitable immunity, such that charitable hospitals are liable for heedless and reckless acts, and applying decision in this case and prospectively); McCormick v. England, 328 S.C. 627, 494 S.E.2d 431 (Ct.App.1997) (first recognizing the common law tort of breach of a physician's duty of confidentiality, and applying decision in this case and prospectively).
[9] Nash's cause of action accrued 3½ years before the Court of Appeals decided Davenport I. We are not confronted with a case in which the cause of action accrued after Davenport I and before Davenport II, which would present a different question.
[10] See also McClain v. South Carolina Dep't of Education, 323 S.C. 132, 473 S.E.2d 799 (1996) (holding that statutory limit in Tort Claims Act does not apply to cases filed before July 1, 1994, even when there are no joint tortfeasors with the governmental entity); Knoke v. South Carolina Dep't of Parks, Recreation, and Tourism, 324 S.C. 136, 478 S.E.2d 256 (1996) (holding that Southeastern Freight Lines and McClain apply to the $500,000 per occurrence cap, not just the $250,000 individual cap); Wooten v. South Carolina Dep't of Transp., 326 S.C. 516, 485 S.E.2d 119 (Ct.App.1997) (determining the statutory limit was inapplicable in case filed before July 1, 1994), aff'd as modified, 333 S.C. 464, 511 S.E.2d 355 (1999).
[11] Accord McCutcheon v. Smith, 199 Ga. 685, 35 S.E.2d 144, 148 (1945) (rejecting as a violation of separation of powers an attempt by legislature to construe legislatively an earlier act in a manner that conflicted with the judicially determined meaning); Roth v. Yackley, 77 Ill.2d 423, 33 Ill.Dec. 131, 396 N.E.2d 520, 522 (1979) (legislature cannot overrule a decision of the supreme court by declaring that an amendment applies retroactively to cases decided before the amendment's effective date); Marine Power & Equipment Co. v. Washington State Human Rights Comm'n, 39 Wash.App. 609, 694 P.2d 697, 700 (1985) ("legislature may not, under the guise of clarification, overrule by legislative enactment a prior authoritative supreme court opinion construing a statute"); 16 C.J.S. Constitutional Law §§ 115-116 (1984) ("legislature may enact a statute to modify, for the future, the law as declared by decisions of the courts").
[1] The other exceptions asserted by Department under §§ 15-78-60(5) (discretionary acts), 15-78-60(4) (adoption or enforcement of law or regulation), and 15-78-60(20) (act or omission of person other than employee) would fall under the general rule that a specific exception applies over a more general one.
[2] The Amusement Rides Safety Code allows for revocation of a permit if Department "determine[s] that an amusement device is ... being operated with a mechanical, electrical, structural design, or other defect which presents an excessive risk of serious injury to passengers, bystanders, operators, or attendants...." S.C.Code Ann. § 41-18-60(D)(3) (Supp.1998). This permit revocation power does not hinge exclusively on making an official inspection.