551 S.E.2d 579

Steven ARTHURS, as Personal Representative of the
ESTATE OF Deborah MUNN, Petitioner,

v.

AIKEN COUNTY, South Carolina Sheriff's
Department, Respondent.

No. 25331.

Supreme Court of South Carolina.

Heard May 24, 2001.
Decided July 23, 2001.

Robert T. Williams and Jonathan R. Hendrix, of Williams, Hendrix, Steigner & Brink, of Lexington, for petitioner.

Vinton D. Lide, of Lexington, for respondent.

PLEICONES, Justice:

Petitioner sued respondent, the Aiken County Sheriff's Department (Department), for negligence leading to the murder

of petitioner's sister (Deborah) by her estranged husband (Husband). The circuit court granted Department's directed verdict motion, and the Court of Appeals affirmed. *Arthurs v. Aiken County, South Carolina Sheriff's Dep't*, 338 S.C. 253, 525 S.E.2d 542 (Ct.App.1999). We granted certiorari to consider issues of duty and the continued viability of the "public duty rule" in light of the South Carolina Tort Claims Act (TCA),[1] and now affirm the decision of the Court of Appeals as modified.

## FACTS

Deborah and Husband were living in separate trailers in a family enclave in rural Aiken County. Around 9 a.m. on September 30, 1994, Deborah called 911 and complained that Husband had tried to run her off the road that morning as she returned home from work. Their daughter testified that she observed Husband speaking to officers of the Department around 5 p.m. that same day as she and Deborah left the trailer for school band practice. No other evidence was offered regarding this conversation.

Around 6 p.m., Deborah was talking on her home phone to her sister, who was in her trailer about 500 feet away. The sister heard knocking on Deborah's trailer door, and told Deborah to hang up and call 911. Deborah did so, as did her sister. Investigator Coleman and Deputy Cain responded. While it is not clear who was knocking on the door, Deborah and her 17–year–old nephew reported to the officers that Husband had approached the nephew and a neighbor (Rob) as they began to work on Deborah's water lines. Husband asked if they "were the gang that's supposed to jump on him." He tried to get nephew to hit him, threw a beer in the nephew's face, and gestured threateningly towards the gun in his back pocket. He was reported to have been "raising hell" in Deborah's front yard.

Husband was not present when the officers arrived. Deputy Cain continued to talk to Deborah and her nephew while Investigator Coleman left to try to locate Husband. In his report, Deputy Cain characterized the nephew as the victim

---

1. S.C.Code Ann. §§ 15–78–10 through –200 (Supp.2000).

and Deborah as the complainant, and he did not document it as a "serious" complaint. When Deborah expressed her fear of Husband, Deputy Cain advised her to go to a safe house. When she declined to leave, he told her she should stay inside behind locked doors and call 911 if Husband returned.

Sometime later that evening, nephew went to join his brother at Kneece's Body Shop to work on a race car. The shop was about 300 yards from nephew's trailer, which was less than 100 yards from Deborah's trailer. Husband was at the shop when nephew arrived, and again tried to start a fight. Nephew turned to walk home, and Husband said, "Go get your Mama and Daddy and I'll send both of them to hell." Husband and his truck were at the Body Shop when nephew left. Department responded to nephew's family's 911 call, but their search for Husband was unsuccessful. His truck remained parked at the shop.

Around 9:30 or 10 p.m. that night, family members heard screaming from Deborah's trailer followed by shots. Husband had forced the neighbor, Rob, to knock on Deborah's door by holding a gun to his back. When Deborah answered the door, Husband forced his way in and killed her by shooting her in the head.

## ISSUES

We granted certiorari to consider three issues:

(1) Whether the "public duty rule" survived the adoption of the TCA?;

(2) Whether the Court of Appeals misread the facts?; and

(3) Whether Department owed Deborah a duty of care?

We hold the public duty rule continues to play its role in our governmental tort liability jurisprudence. Further, we find no factual error in the Court of Appeals' decision although we characterize the evidence and its inferences somewhat differently. Finally, we hold petitioner has not shown a duty running from Department to Deborah. Accordingly, we affirm the Court of Appeals' decision as modified.

## A. *Public Duty Rule and the TCA*

In order to establish liability in a negligence action, the plaintiff must show (1) a duty of care owed by the defendant to the plaintiff; (2) breach of that duty; and (3) damages resulting from the breach. *Tanner v. Florence County Treasurer*, 336 S.C. 552, 521 S.E.2d 153 (1999). An affirmative legal duty to act may be created by statute, contract relationship, status, property interest, or some other special circumstance. *Steinke v. South Carolina Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 520 S.E.2d 142 (1999); *Jensen v. Anderson County Dep't of Social Services*, 304 S.C. 195, 403 S.E.2d 615 (1991). When, and only when, the plaintiff relies upon a statute as creating the duty does a doctrine known as the "public duty rule" come into play.[2]

The enactment of the TCA effectively expanded the scope of actionable governmental duties beyond those predicated upon a statutory duty, as is clear from the language of the Act:

(i) Section 15–78–40 (Supp.2000) provides:

> The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages contained herein.

(ii) Section 15–78–50 (Supp.2000) provides:

> (a) Any person who may suffer a loss proximately caused by a tort of the State, an agency, a political subdivision, or a governmental entity, and its employee acting within the scope of his official duty may file a claim as hereinafter provided.

> (b) In no case is a governmental entity liable for a tort of an employee where that employee, if a private person, would not be liable under the laws of this state.

(iii) *See also* § 15–78–20(a)(Supp.2000) "... Liability for acts or omissions under this chapter is based upon the traditional tort concepts of duty and the reasonably

---

**2.** *See e.g., Douglass v. Boyce,* 344 S.C. 5 n. 3, 542 S.E.2d 715 n. 3 (2001).

prudent person's standard of care in the performance of that duty."

Today, a plaintiff alleging negligence on the part of a governmental actor or entity may rely either upon a duty created by statute or one founded on the common law. As explained below, petitioner relies on both grounds in an effort to establish a duty owed by Department to Deborah.

"The 'public duty' rule presumes statutes which create or define the duties of a public office have the essential purpose of providing for the structure and operation of government or for securing the general welfare and safety of the public. Such statutes create no duty of care towards individual members of the general public." *Summers v. Harrison Constr.*, 298 S.C. 451, 455–56, 381 S.E.2d 493, 496 (Ct.App. 1989). The public duty rule is a negative defense which denies an essential element of the plaintiff's cause of action: the existence of a duty of care to the individual plaintiff. *Rayfield v. South Carolina Dep't of Corrections*, 297 S.C. 95, 105–06, 374 S.E.2d 910, 916 (Ct.App.1988), *cert. denied* 298 S.C. 204, 379 S.E.2d 133 (1989). It is not a matter of immunity, which is an affirmative defense that must be pleaded and which may be waived. *Steinke, supra.* Further, it is a rule of statutory construction, that is, a means of determining whether the legislative body that enacted the statute or ordinance intended to create a private cause of action for its breach. *Jensen, supra.*

The public duty rule insulates public officials, employees, and governmental entities from liability for the negligent performance of their official duties by negating the existence of a duty towards the plaintiff. Whether the adoption of the TCA affects the public duty rule has been mentioned, but not directly decided, in a number of cases. *See, e.g., Steinke, supra,* 336 S.C. at 388 n.3, 520 S.E.2d at 149 n.3 (since both parties have assumed public duty rule survives end of sovereign immunity and enactment of TCA, court did not decide import, if any); *see also Brady Dev. Co., Inc. v. Town of Hilton Head,* 312 S.C. at 76 n.2, 439 S.E.2d at 268 n.2 (1993); *Jensen, supra.*

The issue is, however, squarely raised in this case. The TCA does not create causes of action, but removes the common law bar of sovereign immunity in certain circumstances. *Summers v. Harrison Constr., supra.* Since the public duty rule is not grounded in immunity but rather in duty, *Steinke, supra; Rayfield, supra,* we hold it has not been affected by enactment of the TCA.

The TCA and "public duty rule" are not incompatible and we retain the rule. When the negligence plaintiff's cause of action against a governmental entity is founded upon a statutory duty, then whether that duty will support the claim should be analyzed under the rule. On the other hand, where the duty relied upon is based upon the common law, e.g. the duty to warn in *Rogers v. South Carolina Dep't of Parole & Community Corrections,* 320 S.C. 253, 464 S.E.2d 330 (1995), then the existence of that duty is analyzed as it would be were the defendant a private entity. *Id.*

In addition, many "duties" appear to be limited or eliminated by what are termed "Exceptions to waiver of immunity" in S.C.Code Ann. § 15–78–60 (Supp.2000). Thus, even if negligence (including breach of a duty) is shown, the governmental entity may not be liable because of the immunities reinstituted by the TCA. Only if a duty is found, and the other negligence elements shown, will it ever be necessary to reach the TCA immunities issue.

### B. *Statutory Duties*

Petitioner claims Department breached statutory duties owed to Deborah under the Criminal Domestic Violence (CDV) Act[3] and under a statute describing the duty of a deputy sheriff to patrol a county.[4] The Court of Appeals found no special duty of care under either statute, and thus upheld the grant of a directed verdict. We agree.

The "public duty rule" recognizes that, generally, statutes which create or define the duties of a public office

---

3. S.C.Code Ann. §§ 16–25–10 to –80 (Supp.1994). We refer to the version in effect at the time of Deborah's murder since some sections of the CDV Act have been substantially revised since her death.

4. S.C.Code Ann. § 23–13–70 (1976).

create no duty of care towards individual members of the general public. An exception to the general rule exists when the statutory duty is owed to individuals rather than to the public at large. Our courts are reluctant to find a special duty. *Tanner v. Florence County Treasurer, supra.* In *Jensen, supra,* and *Bellamy v. Brown,* 305 S.C. 291, 408 S.E.2d 219 (1991), this Court adopted a six part test developed by the Court of Appeals in *Rayfield, supra,* for determining when such a "special duty" exists:

(1) an essential purpose of the statute is to protect against a particular type of harm;

(2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm;

(3) the class of persons the statute intends to protect is identifiable before the fact;

(4) the plaintiff is a person within the protected class;

(5) the public officer knows or has reason to know the likelihood of harm to members of the class if he fails to do his duty; and

(6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

■ Petitioner argues the CDV Act creates a special duty to Deborah because it is designed to protect against a particular harm, that is, threats or acts of violence directed by one household member against another (§§ 16–25–10 and –20). In this case, the officers responded to two calls on September 30 where Deborah's nephew, brother, and sister-in-law were designated the victims. To the extent her nephew was the victim, the CDV Act is not even implicated.[5] While Deborah's brother and arguably his wife were related within the second degree to Husband, petitioner points to no breach of duty under the Act by Department towards these victims, much less a breach directed toward Deborah.

---

**5.** *See* § 16–25–10 defining "Household member" as "spouses, former spouses, parents and children, persons related by consanguinity or affinity within the second degree, persons who have a child in common, and a male and female who are cohabiting or formerly have cohabitated."

To the extent Deborah was identifiable as the true object of Husband's hostility, petitioner cannot show where any CDV Act duty was breached. Husband was not present at the scene when the officers arrived, and therefore was not subject to immediate arrest. Further, the evidence shows that Department searched for Husband but could not find him. Finally, Deputy Cain advised Deborah to leave and go to a shelter. Petitioner points to no section of the CDV Act requiring the law enforcement agency to post a guard under these circumstance. In short, assuming the CDV Act is implicated by the facts of this case, petitioner has failed to show the existence of a special duty owed to Deborah, much less breach of such a duty.[6]

▪ Petitioner's second "special duty" argument is predicated on § 23–13–70 which provides:

**The deputy sheriffs shall** patrol the entire county at least twice a week by sections assigned to each by the sheriff, remaining on duty at night when occasion or circumstances suggest the propriety thereof to prevent or detect crime or to make an arrest. They shall always be on duty for not less than ten hours a day, except when granted occasional indulgences or leaves of absence by the sheriff. They shall frequent railroad depots, stores and other public places where people congregate, disorder is probable, vagrants may be loafing or alcoholic liquors may be sold, bartered or given away and they shall as often as practicable ride by houses that are off the public highways and in lonely parts of the county, especially such as are without male protectors, and shall **use every means to** prevent or detect, **arrest** and prosecute for breaches of the peace, drunkenness, using obscene language, boisterous conduct or discharging of firearms on the public highways or at any public place or gathering, carrying weapons contrary to law, gambling, vagrance, setting out fire, violation of the game and fish laws, cruelty to animals or children, violation of the child labor laws, lynching and **for the violation of every law which is detrimental to the peace, good order and morals of the community.**

---

**6.** We do not reach the question whether under different circumstances the CDV Act can be the basis of a "special duty."

(emphasis petitioner's).

Petitioner contends this statute created a special duty on the part of Department to "use every means" to prevent violations of the CDV Act, and/or to arrest violators.

This general statute creates no "special duty," but instead, as the Court of Appeals held, "merely recites, in broad terms, the general duty of a deputy sheriff to patrol the county. . . . The requirements of the *Rayfield* test are not satisfied." *Arthurs, supra.*

We affirm the Court of Appeals' holding that petitioner has not shown a special duty owed to Deborah under either the CDV Act or under § 23–13–70.

### C. *Common Law Duty/Factual Error*

 Petitioner contends the facts of this case establish a legal duty arising from a "special circumstance" because Deputy Cain set Deborah up as "bait" to try to arrest Husband. *See Jensen, supra* (duty can arise from "special circumstance"). Petitioner argues, in connection with this issue, that the Court of Appeals "ignored" Deputy Cain's deposition testimony when it concluded that Cain "did *not* convey to [Deborah] that he wanted to use her as 'bait' in an attempt to capture Husband." *Arthurs,* 338 S.C. at 268, 525 S.E.2d at 550.

The flaw in petitioner's theory is that there is no evidence that the Department was "baiting" a trap with Deborah. The evidence is undisputed that when Deputy Cain responded to the first incident, where Husband threatened Deborah's nephew in her yard, he told her that if she refused to go to a safe house, she should stay indoors behind locked doors and call 911 if Husband returned. In his deposition, he testified that **after Deborah refused his offer** " to help her get to a **safe house**" (emphasis added), he told her to stay behind a locked door and call 911 if Husband came back. He continued:

Just call us and we'll come down here with all of us, we'll take care of him in the front yard. We'll take care of it. And [Deborah] told me young man, she called me young man or called me son, or something to [sic] that nature. I believe she said young man, he's got a gun, and my response to her was, so do I and my friends and we know

what to do with ours and let us take care of a gun problem. **You stay inside but whatever you do, don't unlock the door for him. I wanted her to set him up so he was in the front yard when we show up. That's all I was trying to convey to her and we'll take care of the problem, you know, the way we were trained to, and after that I pretty much left.**

(emphasis added).

Cain explained at trial that he did not convey the "set up" thought to Deborah, but was "insuring [sic] her that myself and my fellow law enforcement officers knew exactly what to do once we came in contact with this man and for her to stay behind a locked door if she did not want to leave the area."

The Court of Appeals relied on the fact that there was no evidence that Deputy Cain *conveyed* to Deborah that he wanted to use her as bait in concluding no special circumstances here gave rise to a duty. In our opinion, it is more accurate to say there was no "baiting" here. Despite Deborah's fear of Husband and his armed appearance in her front yard, Deborah refused Deputy Cain's offer to get her away from there and to a safe location. In context, all that was "conveyed" was to stay indoors and call at the first sighting of Husband, not to wait for him to act provocatively. He did not encourage her to stay in an effort to lure Husband back—he encouraged her to leave. Husband lived one trailer over, and was therefore bound to return at some point; certainly if he were in Deborah's front yard when officers responded to her 911 call, he would be easy to pick out and arrest.

Since we find no evidence of baiting, there is no need to decide whether such conduct can constitute a "special circumstance" giving rise to a common law duty. In light of the lack of evidence, we decline to adopt a test for determining when such a duty may arise. Further, we vacate that part of the Court of Appeals' opinion which adopts the North Carolina test found in *Braswell v. Braswell,* 330 N.C. 363, 410 S.E.2d 897 (1991). We do this in part because the issue is not before us, and in part because North Carolina characterizes this type of common law duty as a "special duty" exception to the "public duty rule." *Id.* at 902. We find the North Carolina language potentially confusing because, as explained above, we

110

restrict the terms public duty/special duty to those arising from statutes.

## Conclusion

The circumstances surrounding Deborah's murder are tragic. Despite our sympathy, however, we cannot find the existence of any duty, much less the breach of such an obligation, under the facts presented here. Accordingly, the decision of the Court of Appeals is

**AFFIRMED AS MODIFIED.**

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.