785 S.E.2d 376

David M. REPKO, Appellant,

v.

COUNTY OF GEORGETOWN, Respondent.

Appellate Case No. 2014–000156.
No. 5374.

Court of Appeals of South Carolina.

Heard Sept. 15, 2015.
Decided Jan. 6, 2016.
Rehearing Denied May 20, 2016.

26

Ryan Patrick Compton, Stephen Lewis Goldfinch, Jr., and Thomas William Winslow, all of Goldfinch Winslow, LLC, of Murrells Inlet, for appellant.

Robert L. Widener, of McNair Law Firm, PA, of Columbia, and David J. Mills, of McNair Law Firm, PA, of Pawleys Island, for respondent.

LOCKEMY, J.

In this negligence action, David M. Repko appeals the trial court's granting of a directed verdict in favor of Georgetown County (the County). Repko argues the trial court erred in (1) construing Article V, Section 3-1 of the County Development Regulations (the Regulations) to preclude a "tort-like" duty when the plain language of that provision disclaims only a "financial-like" obligation [1]; (2) relying on the Regulations' "sovereign immunity" provision when that provision is unenforceable because it is preempted by the South Carolina Tort Claims Act (TCA); (3) finding the Regulations did not create a special duty owed to him under the "special duty test"; (4)

---

1. Our review of the record indicates Repko never raised this argument at trial, in his motion to reconsider, or at the motion to reconsider hearing, and the trial court never addressed these arguments in its orders. Therefore, we find this argument is unpreserved. *See In re Walter M.*, 386 S.C. 387, 392, 688 S.E.2d 133, 136 (Ct.App.2009) ("Arguments raised for the first time on appeal are not preserved for our review.").

finding subsections 15–78–60(4), (5), and (13) of the TCA provided the County with immunity to his negligence claim; and (5) not recusing itself based upon prior business relationships concerning the transactions involved.

## FACTS

Repko is the owner of two lots in Phase 2–D–1 of the West Stewart Subdivision of Harmony Township—a planned unit development in Georgetown County. In April 2012, he filed a civil action for damages against the County. He alleged the County's gross negligence in handling a financial guarantee posted by the developer, Harmony Holdings, LLC (the Developer), resulted in the loss of most of the funds that were to be used in building the subdivision's infrastructure. Repko asserted (1) the Developer failed to complete the infrastructure, (2) there were insufficient funds to complete the infrastructure (due to the County's gross negligence), and (3) the lack of infrastructure reduced his property value to "zero." As a result of the County's negligence, Repko sought to recover "past and future actual damages."

The County filed an answer, denying liability and raising several affirmative defenses. The County alleged (1) it did not owe a duty to Repko; (2) the TCA [2]—specifically, subsections 15–78–60(1), (2), (4), (5), (12), and (13) of the South Carolina Code (2005)—barred Repko's claims; and (3) the statute of limitations also barred the claims.

Repko's case proceeded to trial, where the following facts developed. Wesley Bryant, the County attorney, explained that in South Carolina, a developer is generally not allowed to sell lots that do not have the requisite infrastructure—roads, water, and sewer—prior to their development. Under the Regulations, however, a developer could post cash, bonds, financial guarantees, or letters of credit in lieu of completing the infrastructure before selling the lots. Bryant stated the purpose of a financial guarantee is to ensure money is available to complete the subdivision's infrastructure "if the developer goes belly up." Bryant explained a letter of credit is "a document ... from a financial institution to the County as a beneficiary that simply states that the development has a

---

**2.** S.C.Code Ann. §§ 15–78–10 to –220 (2005 & Supp.2015).

financial guarantee of ... the proposed total cost of the infrastructure to be placed ... in that development." Under a letter of credit, the bank is the issuer and the County is the beneficiary. Bryant testified property owners are not beneficiaries on a letter of credit but a letter of credit does protect the property owners. Bryant stated that, under the Regulations, the County is not required to accept a financial guarantee and may require the developer to complete the infrastructure before it is allowed to sell lots in a subdivision.

The County regulates improvements to major subdivisions through Article V of the Regulations. Article V, Section 1–5 provides, "Final plans shall not be approved for recording unless the [developer] has installed the required improvements as specified and required in this Article, or has provided a financial guarantee as specified in Section 3 of this Article." "Required improvements" include installation of monuments at street corners; a storm water management system; specified roadway improvements, including grading and paving; and utilities and services.

Article V, Section 3–1 states as follows:

Financial guarantees may be posted in lieu of completing improvements required by this Ordinance to allow for the recording of a final plat or to obtain building permits for properties for which ownership will be transferred. . . .

Acceptance of financial guarantees is discretionary[,] and [the] County reserves the right to refuse a financial guarantee for any remaining improvements and require that such improvements be completed before the recording of a final plat or issuance of building permits. Acceptance of a financial guarantee by [the] County shall not be construed as an obligation to any other agency, utility or property owner within affected developments.

The Regulations provide a procedure that must be followed if a developer wants to post a financial guarantee. First, the financial guarantee must be submitted to the County's Planning Department along with an "itemized cost estimate" for the improvements the financial guarantee will cover. The itemized cost estimate must (1) bear the original signature and seal of a licensed professional engineer, (2) be on company letterhead, and (3) be in a form acceptable to the Planning

Department.  Article V, Section 3–2 provides, "Upon receipt of an itemized cost estimate, the Planning Department shall forward such estimate to the appropriate departments or agencies for review."

Under the Regulations, the County may accept a letter of credit as a financial guarantee.  Article V, Section 3–3 states an approved letter of credit must (1) be equal to 125% of the approved cost estimate;  (2) be issued for an initial coverage period not less than twelve months from the date the final plat is filed for recording;  (3) be irrevocable, unconditional, and subject to presentation for drawing within South Carolina;  (4) be payable to the County;  (5) be for at least $10,000 in construction;  and  (6) substantially conform to a required format.

If the County accepts a financial guarantee from the developer, it generally holds the guarantee until all covered improvements are completed unless a reduction in the guarantee has been approved pursuant to the following procedure set forth in Article V, Section 3–5:

A developer may reduce a financial guarantee during the initial coverage period.  A request to reduce the financial guarantee shall be submitted to the Planning Department and include a revised construction cost estimate.  The Planning Department will forward the revised cost estimate to [the] County Department of Public Works for approval. Reductions of financial guarantees will not be allowed within [six] months of any previous reduction request and shall be no less than 125% of the revised construction cost estimate.

Holly Richardson, the Planning Department's chief planner, stated the County was not required to reduce a financial guarantee or letter of credit.  Richardson and the Planning Department's director, Boyd Johnson, both stated that before the County would agree to reduce a letter of credit, it required "a letter from the engineer certifying that the work had been complete[d] and certifying the number[ and] the dollar amounts that were left to be done."

In the early 2000s, the Developer began developing the Harmony Township community within Georgetown County. Although roads, utilities, and other required improvements were not constructed in the community, the Developer sought

permission from the Planning Department to begin selling the undeveloped lots to buyers. The County allowed the Developer to post letters of credit as financial guarantees in lieu of completing the required improvements. The Developer posted a letter of credit for each phase of Harmony Township, including Phase 2–D–1, the phase at issue in this appeal.

In 2006, the Developer applied to Wachovia Bank to obtain a letter of credit for Phase 2–D–1. Wachovia granted the application and issued a letter of credit on May 23, 2006, in the amount of $1,301,705.63 (Wachovia letter of credit). The Wachovia letter of credit designated the County as the beneficiary and the Developer as the applicant. Shortly thereafter, the Developer submitted the Wachovia letter of credit to the Planning Department. It also submitted an engineer's estimate of $1,040,000.00 as the cost of completing the required improvements. Thus, the $1,301,705.63 Wachovia letter of credit was 125% of the engineer's estimate as required under the Regulations. The Planning Department accepted the letter of credit and permitted the Developer to sell undeveloped lots in Phase 2–D–1.

On July 20, 2006, the Developer requested a reduction in the Wachovia letter of credit. The County approved a request to reduce the letter of credit by $331,311.00. Repko presented evidence that the County approved this request despite noncompliance with the Regulations and the Planning Department's protocol. First, the County approved the request without the required letter of an engineer certifying "the work had been complete[d] and . . . the dollar amounts that were left to be done." Second, the County approved the request without "forward[ing] the revised cost estimate to the Georgetown County Department of Public Works for approval." Third, the County approved the request even though it indicated that the Developer sought to use the letter of credit funds to pay its contractor, contrary to Article V, Section 3–3. Fourth, an engineer's cost of completion estimate made by Earthworks, the engineering firm hired by the Developer, showed the County approved the request without retaining 125% of the funds needed to complete the infrastructure; the estimate showed virtually no work was done at that time on the infrastructure for Phase 2–D–1. Pursuant to the County's

letter, Wachovia released $331,000.00, thereby reducing the letter of credit to $970,394.63.

On October 9, 2006, the County approved a second request for reduction and advised Wachovia to reduce the letter of credit by $117,024.42. The County approved the second request for reduction (1) without a letter from an engineer certifying that the work had been done and providing a cost of completion estimate; (2) without forwarding a cost of completion estimate to the Department of Public Works for completion; (3) without retaining 125% of the funds needed to complete the infrastructure; (4) even though the request indicated the Developer was seeking to use the letter of credit funds to pay its contractor; and (5) even though the reduction was requested within six months of the previous request, contrary to Article V, Section 3–5. Wachovia released $117,024.42, thereby reducing the letter of credit to $853,370.21.

On November 8, 2006, the County approved a third request for reduction and advised Wachovia to reduce the letter of credit by $300,000.00. Richardson testified the third reduction request was approved based upon Earthworks' "letter and approval of the $300,000." The County again approved the request (1) without a letter from an engineer certifying that the work had been done and providing a cost of completion estimate, (2) without having sought approval from the Department of Public Works, (3) without retaining 125% of the funds needed to complete the infrastructure, (4) even though the request indicated that the Developer was using letter of credit funds to pay its contractor, and (5) even though the request was made within six months of the earlier two requests. Pursuant to the County's letter, Wachovia released $300,000.00, thereby reducing the letter of credit to $553,370.21.

In December 2006, Earthworks advised the County's Public Works Department that it "reviewed and accepted the following changes in price to [Phase 2–D–1 and Phase 2–D–2]." An "Opinion of Probable Cost" for Phase 2–D–1 provided an estimated cost of $1,153,205.45 to complete the sewer and water systems and the remaining improvements for the roads, site, and drainage. Thus, the cost of completing the infra-

structure for Phase 2–D–1 in December 2006 was higher than the original estimate of $1,040,000.00.

On March 9, 2007, the Developer requested a fourth reduction in the Wachovia letter of credit by an amount of $396,666.18. On April 5, 2007, the County approved the request and advised Wachovia to reduce the letter of credit by $396,666.18. The County approved this request (1) without having sought approval from the Department of Public Works, (2) without retaining 125% of the funds needed to complete the infrastructure, (3) even though the Application and Certificate for Payment indicated that the Developer was using letter of credit funds to pay its contractor, and (4) even though the request was made within six months of the earlier two requests. Pursuant to the County's letter, Wachovia released $396,666.18, thereby reducing the letter of credit to $156,704.03.

In April 2007, the County Water and Sewer District advised the County that an inspection of the water and sewer lines in Phase 2–D–1 was completed. The letter stated, "Based upon this inspection, it appears that construction of the sewer mainlines, manholes[,] and sewer service laterals as permitted for the project have been completed." The letter did not give an estimate of the cost to complete the infrastructure.

At some point before the Wachovia letter of credit expired on May 23, 2007, the Developer gave the County a $140,000.00 check. The County placed these funds in a separate account to be used at Harmony. The County cashed in a letter of credit covering Phase 2–D–2, but it did not cash in the letter of credit for Phase 2D–1. In August 2007, the Developer informed the County that it "no longer had the financial means to put any infrastructure within any phase of Harmony," and because the letters of credit were about to expire, the Developer advised the County "to call all the letters of credit that were still in good standing."

The Developer subsequently declared bankruptcy. At that time, the Developer had failed to complete basic infrastructure, such as utilities or roads, within Phase 2–D1. A new owner later took over the project, hired his own contractor, and requested the County release funds for payment to the contractor after work was completed. The County released

funds "quite a few times and maybe for a year after that"; however, the County ultimately deemed the new owner untrustworthy and stopped the release of funds. As a result, the new developer quit. Bryant testified the County does not have enough money to complete the infrastructure for Phase 2–D–1.

Repko testified there is no prospect of anybody completing the infrastructure for Phase 2–D–1. He described his lots as "woods" accessible by a path cleared out seven years ago but inaccessible by road. Because of the missing infrastructure, Repko believes the value of his property is "zero." He claimed that within the last eighteen months, only one lot in the development has sold and the sale price was $500. Repko has paid the property taxes for his lots, but the County will not allow him to build on his property because of the absence of basic utilities.

The County moved for a directed verdict at the close of Repko's case. The trial court directed a verdict in favor of the County on the following grounds: (1) the Regulations did not create a private duty owed to Repko and (2) the County was immune from liability under subsections 15–78–60(4), (5), and (13) of the TCA.[3] Repko filed a motion to reconsider, which the trial court denied by form order.

## STANDARD OF REVIEW

"The appellate court will reverse the trial court's ruling on a directed verdict motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Jones v. Lott,* 379 S.C. 285, 288–89, 665 S.E.2d 642, 644 (Ct.App.2008), *aff'd,* 387 S.C. 339, 692 S.E.2d 900 (2010). "In ruling on a motion for directed verdict, the trial court must view the evidence and the inferences which reasonably can be drawn therefrom in the light most favorable to the party opposing the motion." *Erickson v. Jones St. Publishers, LLC,* 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006). "The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor." *Id.* "If the evidence

---

3. The trial court rejected the County's argument that it was immune from liability under subsection 15–78–60(12) of the TCA.

is susceptible to more than one reasonable inference, the case should be submitted to the jury." *Id.*

In a negligence action, "[t]he court must determine, as a matter of law, whether the law recognizes a particular duty." *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999). "If there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Id.*

## LAW/ANALYSIS

### I. Duty

#### A. Role of Article V, Section 3-1

Repko argues the trial court erred in relying on Article V, Section 3-1 to find the County did not owe him a duty because that provision is preempted by the TCA and is therefore unenforceable. Specifically, Repko asserts the TCA governs the County's tort liability and the County cannot override application of the TCA by enacting an ordinance that waives liability for its negligent conduct. We agree. "[S]overeign immunity historically acted to protect a governmental entity from all liability for loss in a negligence action." *Adkins v. Varn*, 312 S.C. 188, 190, 439 S.E.2d 822, 823 (1993). In *McCall v. Batson*, 285 S.C. 243, 244, 329 S.E.2d 741, 741 (1985), our supreme court abolished sovereign immunity, and as a result, the General Assembly enacted the TCA. *Adkins*, 312 S.C. at 190, 439 S.E.2d at 823.

Under the TCA, "[t]he State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein." S.C.Code Ann. § 15–78–40 (2005). Notwithstanding any provision of law, the TCA "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C.Code Ann. § 15–78–200 (2005).

"Express preemption occurs when the General Assembly declares in express terms its intention to preclude local

action in a given area." *S.C. State Ports Auth. v. Jasper Cty.,* 368 S.C. 388, 397, 629 S.E.2d 624, 628 (2006).

■ We find the County cannot avoid application of the TCA by disclaiming a duty through Article V, Section 3–1 for two reasons. First, the TCA preempts Article V, Section 3–1's disclaimer of liability. We disagree with the trial court's finding that the County could waive its tort liability by including disclaimer language in a county ordinance. Article V, Section 3–1 is a county ordinance, and it cannot dictate the application of the TCA, which the General Assembly expressly stated "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." *See* § 15–78–200; *see also* § 15–78–40 (stating a governmental entity is liable for its torts "in the same manner and to the same extent as a private individual under like circumstances"); *S.C. State Ports Auth.,* 368 S.C. at 397, 629 S.E.2d at 628 ("Express preemption occurs when the General Assembly declares in express terms its intention to preclude local action in a given area."). A governmental entity cannot override application of the TCA through language in a local ordinance disclaiming all liability. Accordingly, the trial court's construction of Article V, Section 3–1 was erroneous because Article V, Section 3–1 is preempted by the TCA.

■ The second reason the County cannot avoid application of the TCA hinges on our interpretation of the term "obligation" under Article V, Section 3–1. *See* Article V, Section 3–1 ("Acceptance of a financial guarantee by [the] County shall not be construed as an obligation to any other agency, utility or property owner within affected developments."). We find that disclaiming an "obligation" to property owners when the County accepts a financial guaranty means the County is not required to pay to the property owners the money made available through the letter of credit or other financial guarantee and the County is allowed to complete the infrastructure and ignore the preferences of the property owners in doing so.

## B. The Public Duty Rule and Special Duty Exception

■ Repko also argues that, under Article V, Section 3–1, the County owed a special duty to him, as a lot purchaser,

36

with respect to the County's management of the financial guaranty that allowed the Developer to sell lots to him. We agree.

"In a negligence cause of action, it is the plaintiff's burden to establish that a duty of care is owed to him by the defendant." *Trask v. Beaufort Cty.*, 392 S.C. 560, 566, 709 S.E.2d 536, 539 (Ct.App.2011). "Although a statute may impose a duty to act upon a public official, the official may also be immune from a private right of action under the public duty rule." *Vaughan v. Town of Lyman*, 370 S.C. 436, 441, 635 S.E.2d 631, 634 (2006). "This rule holds that public officials are generally not liable to individuals for their negligence in discharging public duties as the duty is owed to the public at large rather than anyone individually." *Id.* (quoting *Steinke*, 336 S.C. at 388, 520 S.E.2d at 149).

> The public duty rule is a rule of statutory construction which aids the court in determining whether the legislature intended to create a private right of action for a statute's breach. It is a negative defense which denies the existence of a duty of care owed to the individual. The public duty rule should not be confused with the affirmative defense of immunity. Therefore, the dispositive issue is not whether [the statute] creates a duty, but rather whether the statute was intended to provide an individual a private right of action thereunder.

*Id.* at 442, 635 S.E.2d at 634 (citations omitted). "Since the public duty rule is not grounded in immunity but rather in duty, ... it has not been affected by enactment of the TCA." *Arthurs ex rel. Estate of Munn v. Aiken Cty.*, 346 S.C. 97, 105, 551 S.E.2d 579, 583 (2001) (citations omitted). "Only if a duty is found, and the other negligence elements shown, will it ever be necessary to reach the TCA immunities issue." *Id.*

Our supreme court has carved out a narrow exception to the public duty rule and found a statute imposes a "special duty" on a governmental entity if the following six-part test is met:

> (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before

the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know the likelihood of harm to members of the class if he fails to do his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

*Edwards v. Lexington Cty. Sheriff's Dep't*, 386 S.C. 285, 291–92, 688 S.E.2d 125, 129 (2010) (quoting *Jensen v. Anderson Cty. Dep't of Soc. Servs.*, 304 S.C. 195, 200, 403 S.E.2d 615, 617 (1991)).

The trial court found Repko failed to satisfy elements two and three of the "special duty test." [4] Concerning element two, the trial court found the Regulations did not impose on any specific public officer of Georgetown County a duty to guard against or not cause a specified harm. Because the Regulations state that both the Planning Department and the Department of Public Works have the duty to oversee any reduction of the financial guarantee, the trial court erred in finding the second element unsatisfied. The Regulations state, "A request to reduce the financial guarantee shall be submitted to the Planning Department. . . . The Planning Department will forward the revised cost estimate to [the] County Department of Public Works for approval." Our appellate courts have found the "specific public officer" element satisfied by statutory language identifying a specific agency or specific employees of that agency. *See Steinke*, 336 S.C. at 390, 520 S.E.2d at 151 (finding the "specific public officer" element met when "[the] Department's director *and his designees* " were "charged with the affirmative duty of administering and enforcing" a statute (emphasis added)); *Jensen v. Anderson Cty. Dep't of Soc. Servs.*, 304 S.C. 195, 203, 403 S.E.2d 615, 619 (1991) (finding the element satisfied when a statute imposed a duty to act on "the local child protection agency and its social workers"). The language of the second element stating that a statute may impose a duty

---

**4.** The trial court did not address elements one, four, five, and six of the special duty test, and the County does not argue these four elements are not met. Therefore, these elements are essentially conceded. Regardless, based on our review of the record and relevant law, we find these four elements were satisfied.

on a specific public officer "directly or indirectly" further supports our finding that the second element is satisfied here.

In addition, the trial court found element three was not satisfied because Article V, Section 3–1 "specifically disclaim[s] any obligation on the part of the County as a result of the acceptance of a financial guarantee." As stated previously, Article V, Section 3–1 is preempted by the TCA. Therefore, the trial court's construction of Article V, Section 3–1 as disclaiming all liability resulting from the County's acceptance of a financial guarantee is unenforceable. Consequently, we find the trial court erred in relying on Article V, Section 3–1 in finding the class of persons the Regulations intended to protect was not identifiable before the fact.

We also find the third element was satisfied because the class of persons the statute intended to protect was identifiable before the fact. When considering the Regulations as a whole, the purpose was to protect the property owners in Phase 2–D–1. The property owners in the subdivision were the only group that would benefit from the requirement that infrastructure be completed or financial guarantees be in place before the Developer was allowed to sell lots in a subdivision. Furthermore, the property owners were identifiable as a class before the County agreed to reduce the financial guarantee. Therefore, we find the class of persons the statute intended to protect was identifiable before the fact.

Based on the foregoing, we find Repko satisfied the six-element special duty test.

### C. *Brady Development Co. v. Town of Hilton Head Island*

Repko next argues the trial court erred in relying on *Brady Development Co. v. Town of Hilton Head Island*, 312 S.C. 73, 439 S.E.2d 266 (1993), to find the County did not owe him a special duty. We agree.

In *Brady*, the developers of a 244–lot subdivision applied for approval of their final development plan in accordance with the Hilton Head Development Standards Ordinance. *Id.* at 74, 439 S.E.2d at 267. The preamble of the Development Standards Ordinance stated, "The town council finds that the health, safety and welfare of the public is in actual danger . . .

if development is allowed to continue without limitation." *Id.* at 77, 439 S.E.2d at 268 (alteration in original). To obtain a permit to sell lots before the completion of required infrastructure, the Development Standards Ordinance required the developer to post a letter of credit to guarantee the completion of the development. *Id.* at 74–75, 439 S.E.2d at 267. The Town allowed the developer to "draw down" on the letter of credit as the improvements were completed. *Id.* at 75, 439 S.E.2d at 267. The Department of Health and Environmental Control and the Town Engineer eventually approved the completed water and sewer infrastructure; however, the Public Service District refused to approve the systems for operation because the developer went bankrupt without paying the construction fee. *Id.* A contractor for Brady, a property owner in the development, was later required to stop construction on Brady's house because water and sewer infrastructure had not been approved. *Id.* The house was vandalized and eventually burned. *Id.*

Brady sued the Town, claiming it had negligently administered its Development Standards Ordinance. *Id.* The Town moved for a directed verdict, arguing the Development Standards Ordinance did not create a special duty owed to Brady as an individual lot owner. *Id.* The trial court denied the Town's motion, finding the Town owed a special duty to Brady under the ordinance. *Id.* The jury returned a verdict for Brady, and the Town appealed. *Id.* at 76, 439 S.E.2d at 267. In reversing the trial court, our supreme court relied on the public duty rule in holding the trial court erred in ruling the ordinance created a special duty. *Id.* at 76–78, 439 S.E.2d at 268. Specifically, the supreme court stated,

We hold that the Development Standards Ordinance does not create a special duty to Brady. The essential purpose of the ordinance is to protect the public from the dangers of overdevelopment on the Island of Hilton Head. Brady argues that the essential purpose of the ordinance is to protect those who buy lots, building sites[,] and buildings because the ordinance requires improvements and services agreements to be in existence or a surety guaranteeing these services for a development permit to be granted. To recognize such a duty would make the Town substantially an insurer of all developments it undertook to inspect and

control through its Development Standards Ordinance and would likely discourage all efforts at such control.

*Id.* at 77, 439 S.E.2d at 268.

Here, the court found no duty existed under Brady because "[t]o recognize such a duty would make the [County] substantially an insurer of all developments it undertook to inspect and control through its Development [Regulations] and would likely discourage all efforts at such control." This finding was error because this case is distinguishable from *Brady*.

Unlike the Regulations, the *Brady* ordinance was enacted to protect the public at large rather than to protect a specific group of people. Specifically, the purpose of the Regulations is not to "protect the public from the dangers of overdevelopment," as was the purpose of the *Brady* ordinance. *See id.* at 77, 439 S.E.2d at 268 (noting the preamble of the Development Standards Ordinance stated "[t]he town council finds that the health, safety and welfare of the public is in actual danger ... if development is allowed to continue without limitation" (alteration in original)). The Regulations contain no express language declaring their purpose; however, reviewing the Regulations as a whole, the purpose of the Regulations is to protect property owners in the subdivision in the event the developer does not complete the required infrastructure.

At oral argument, the County's attorney asserted the Regulations did not need a preamble like the one in *Brady* because Article V, Section 3–1 stated the County's acceptance of a financial guarantee "shall not be construed as an obligation to any ... property owner within affected developments." However, our interpretation of the term "obligation" in Article V, Section 3–1, as discussed above, does not obviate the need for language like that found in the ordinance preamble in *Brady*. Accordingly, we find the trial court erred in relying on *Brady* to find the County did not owe a special duty to Repko.

## II.   Tort Claims Act

Repko asserts because the County pled subsection 15–78–60(12) as an affirmative defense in its answer, "South Carolina law mandates that a similar gross negligence excep-

tion be read into subsections 15–78–60(4), (5), and (13)." We agree.

Under subsection 15–78–60(12),

[t]he governmental entity is not liable for a loss resulting from ... *licensing powers or functions including,* but not limited to, *the* issuance, denial, suspension, *renewal,* or revocation *of* or failure or refusal to issue, deny, suspend, renew, or revoke *any permit,* license, certificate, *approval,* registration, order, or similar authority *except when the power or function is exercised in a grossly negligent manner[.]*

(emphases added). "Generally, this exception is applied where a governmental agency actually engages in licensing functions." *Plyler v. Burns,* 373 S.C. 637, 652, 647 S.E.2d 188, 196 (2007). The supreme court has held that "when an exception containing the gross negligence standard applies, that same standard will be read into any other applicable exception. Otherwise, portions of the Act would be a nullity, which the Legislature could not have intended." *Steinke,* 336 S.C. at 398, 520 S.E.2d at 155.

Subsection 15–78–60(12) grants immunity for losses resulting from the "renewal" of a permit. The County approved reductions of the letter of credit and, in doing so, allowed the renewal of the permit to sell lots even though the letter of credit had been improperly reduced. Based on this evidence, a jury could have found subsection 15–78–60(12) applied. When subsection 15–78–60(12) applies, the gross negligence standard can be extended to apply to any other applicable immunity subsection. *Plyler,* 373 S.C. at 651, 647 S.E.2d at 196 ("When a governmental entity asserts an exception to the waiver of immunity and any other applicable exception contains a gross negligence standard, the Court must read the gross negligence standard into all of the exceptions under which the entity seeks immunity.").

Repko also argues the trial court erred in finding subsections 15–78–60(4), (5), and (13) of the TCA provided the County with immunity to his negligence claim.[5] Because the trial court erred in failing to read the gross negligence stan-

5. Subsection 15–78–60(4) provides a governmental entity is not liable for a loss resulting from the "adoption, enforcement, or compliance

dard into the exceptions in subsections (4), (5), and (13), an error of law controlled the directed verdict in the County's favor. *See Jones,* 379 S.C. at 288–89, 665 S.E.2d at 644 ("The appellate court will reverse the trial court's ruling on a directed verdict motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law."). On remand, the trial court should reexamine the applicability of subsections (4), (5), and (13) under a gross negligence standard.

## III. Recusal

Repko argues the trial judge, Judge Culbertson, erred in not recusing himself because he had previously been hired by Harmony Holdings to handle real estate transactions. Because this issue was raised for the first time at the hearing on the motion to reconsider, it is unpreserved. *See Johnson v. Sonoco Prods. Co.,* 381 S.C. 172, 177, 672 S.E.2d 567, 570 (2009) ("An issue may not be raised for the first time in a motion to reconsider.").[6]

## CONCLUSION

For the foregoing reasons, the trial court's decision is

**REVERSED AND REMANDED.**[7]

---

with any law or any failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies." Subsection 15–78–60(5) states a governmental entity is not liable for a loss resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." Subsection 15–78–60(13) provides a governmental entity is not liable for a loss resulting from "regulatory inspection powers or functions, including failure to make an inspection, or making an inadequate or negligent inspection, of any property to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety."

6. We note that Judge Culbertson stated at the motion to reconsider hearing that he handled several closings for people who purchased lots at the Harmony development but that was the extent of his involvement with the Harmony development. The record contains no evidence that he was involved in any transaction in this case.

7. As an additional sustaining ground, the County asserts the trial court erred in denying its directed verdict motion on the grounds that the

FEW, C.J., concurs.

KONDUROS, J., concurs in result only.

---

statute of limitations barred this action. Viewing the evidence in the light most favorable to Repko, a question of fact existed as to when Repko should have discovered he had a claim against the County. Therefore, the trial court did not err in denying the County's directed verdict motion on this ground. *See Logan v. Cherokee Landscaping & Grading Co.*, 389 S.C. 611, 618, 698 S.E.2d 879, 883 (Ct.App.2010) ("If there is conflicting evidence as to whether a claimant knew or should have known he or she had a cause of action, the question is one for the jury.").